# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

INTERNATIONAL LABOR RIGHTS FORUM
d/b/a GLOBAL LABOR JUSTICE-
INTERNATIONAL LABOR RIGHTS FORUM,
1634 I Street, NW, Suite 1000, Washington, D.C.
20006,

|  | |
|---|---|
| Plaintiff, | Civil Action No. _____ |
| v. | |
| BUMBLE BEE FOODS, LLC, 280 10th Avenue, San Diego, CA 92101, | |
| Defendant. | |

## NOTICE OF REMOVAL

Defendant Bumble Bee Foods, LLC ("Bumble Bee") hereby removes this action from the Superior Court of the District of Columbia to the United States District Court for the District of Columbia pursuant to 28 U.S.C. §§ 1332(a), (d), 1367, 1441(a), (b), 1446, and 1453(b),[1] and states as follows:

## TIMELINESS OF REMOVAL

1.      Plaintiff International Labor Rights Forum d/b/a Global Labor Justice-International Labor Rights Forum ("GLJ-ILRF") filed this action against Bumble Bee on March 21, 2022, in the Superior Court of the District of Columbia as Civil Action No. 2022 CA 001235B.  Bumble Bee was served with the complaint and summons on April 4, 2022.

2.      This Notice of Removal is timely because it is filed within 30 days of service.  *See* 28 U.S.C. § 1446(b).

---

[1]  By filing this Notice of Removal, Bumble Bee does not waive any right, defense, affirmative defense, or objection, including any challenges to personal jurisdiction over Bumble Bee.  *See, e.g.*, *Rivera* v. *Bally's Park Place, Inc.*, 798 F. Supp. 2d 611, 615 (E.D. Pa. 2011).

**NATURE OF THE ACTION**

3.     Plaintiff GLJ-ILRF, a citizen of the District of Columbia, brings suit on its own behalf and on behalf of District of Columbia consumers, against an out-of-state defendant, seeking injunctive relief and attorneys' fees that, if granted, would exceed the $75,000 jurisdictional threshold, even if divided among the allegedly injured parties.  This Court has subject matter jurisdiction over the instant action because it may exercise diversity jurisdiction, 28 U.S.C. §§ 1332, 1441(b), as well as jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d).[2]

4.     Plaintiff GLJ-ILRF is a nonprofit incorporated and based in the District of Columbia.  It brings this suit purportedly seeking to address "unfair and dangerous labor practices in the commercial fishing of the seafood that ends up in Bumble Bee Products."  Compl. ¶ 7. Plaintiff claims that Bumble Bee, which is organized in Delaware and has its principal place of business in California, violated the District of Columbia Consumer Protection Procedures Act ("CPPA"), D.C. Code §§ 28-3901 *et seq.*, through "deceptive marketing representations that purport to ensure fair labor practices and worker safety."  Compl. ¶ 9.

5.     According to the Complaint, Bumble Bee advertises its products with phrases such as "best-in-class culture of safety" and "fair and responsible working conditions" when, in fact, "*Bumble Bee sells tuna products* caught by laborers who are subjected to inhuman conditions that do not meet the standards Bumble Bee set for itself."  Compl. ¶ 79 (emphasis added).  But the Complaint does not allege any facts showing that Bumble Bee actually sells tuna sourced from any such laborers, or that Bumble Bee even directly sources tuna from any such laborers.

---

[2]   Bumble Bee reserves the right to further elaborate on these grounds for removal, and provide evidence in support thereof, beyond the jurisdictional allegations in this Notice.  *See Dart Cherokee Basin Operating Co., LLC* v. *Owens*, 574 U.S. 81, 87–89 (2014).

6.  Plaintiff nonetheless claims that it is misleading for Bumble Bee to call its practices "best-in-class" without disclosing the alleged risks in its parent company's supply chain.  *Id.* ¶¶ 6, 19, 31, 41, 43, 63.  But Plaintiff fails to disclose the subject matter of Bumble Bee's "best-in-class" superlative.  It does not refer broadly to Bumble Bee's supply chain, but to Bumble Bee's promise to "continue to champion [its] best-in-class culture of safety *in Bumble Bee facilities*."[3]  This is a far cry from promising best-in-class safety practices aboard the fishing vessels of third-party suppliers.  And Plaintiff does not allege any facts indicating that the statement is false or misleading as to Bumble Bee's own facilities.

7.  Plaintiff seeks declaratory and injunctive relief, as well as costs and attorneys' fees. Compl. ¶ 17.

## GROUNDS FOR REMOVAL

### A.     This Court Has Diversity Jurisdiction Over the Action.

8.  This action is removable under 28 U.S.C. § 1332 and § 1441 because the action is between citizens of different states and the amount in controversy far exceeds $75,000.

9.  A defendant may remove "any civil action brought in State court of which the district courts of the United States have original jurisdiction."  28 U.S.C. § 1441(a).

10.  Federal district courts have "original," diversity jurisdiction over civil actions for which (1) there is "complete diversity," meaning that no plaintiff is a citizen of the same State as any defendant; and (2) the amount in controversy "exceeds the sum or value of $75,000."  28 U.S.C. § 1332(a); *Lincoln Prop. Co.* v. *Roche*, 546 U.S. 81, 89 (2005).  Both criteria are satisfied here.

---

[3]  The Bumble Bee Seafood Company, *Impact: Sustainability and Social Impact*, https://thebumblebeecompany.com/impact/ (last visited Apr. 17, 2022)  (emphasis added) (cited in Compl. ¶¶ 19, 21, 41).

3

11.     "[C]omplete diversity" is present because the sole Plaintiff and the sole Defendant in this action are citizens of different states.  28 U.S.C. § 1332(a)(1); *see also id.* § 1332(e) (providing that the District of Columbia is a "State" for purposes of Section 1332(a)(1)).  For purposes of diversity jurisdiction, a corporation—including a not-for-profit corporation—is a citizen of the state in which it is incorporated, and the state in which it has its principal place of business.  *Id.* § 1332(c)(1); *see North* v. *Smarsh, Inc.*, 160 F. Supp. 3d 63, 79 (D.D.C. 2015).

12.     Plaintiff GLJ-ILRF is a citizen of the District of Columbia because, according to the allegations of the Complaint, Plaintiff is "registered as a nonprofit in the District of Columbia." Compl. ¶ 70.

13.     Defendant Bumble Bee is a privately-held limited liability company that is organized under the laws of Delaware and has its primary place of business in San Diego, California.  Compl. ¶ 64.

14.     The "in-state defendant rule" does not bar removal of this case because Bumble Bee is not a citizen of the District of Columbia and therefore is not "a citizen of the State in which such action is brought."  28 U.S.C. § 1441(b)(2).  The parties are therefore "completely diverse."

15.     The amount in controversy also far "exceeds the sum or value of $75,000."  28 U.S.C. § 1332(a)(1).  In measuring the amount in controversy for purposes of diversity jurisdiction, a court must assume that the allegations of the complaint are true and assume that a jury will return a verdict for the plaintiff on all claims made in the complaint, no matter how baseless they might be.  *See Lovelle* v. *State Farm Mut. Auto Ins. Co.*, 235 F. Supp. 3d 217, 223–24 (D.D.C. 2017).  A defendant's notice of removal "need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold."  *Beyond Pesticides* v. *Dr. Pepper Snapple Grp., Inc.*, 322 F. Supp. 3d 119, 121 (D.D.C. 2018) (quoting *Dart Cherokee*, 574 U.S. at 89).

16.     Where, as here, a plaintiff seeks injunctive relief, the amount in controversy is "measured by the value of the object of the litigation."  *Hunt* v. *Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 347 (1977).  This value can be calculated from "either viewpoint," meaning the "value of the right that plaintiff seeks to enforce or to protect" or "the cost to the defendant to remedy the alleged denial."  *Smith* v. *Washington*, 593 F.2d 1097, 1099 (D.C. Cir. 1978).  Thus, "[t]he value of injunctive relief for determining the amount in controversy can be calculated as the cost to the defendant."  *GEO Specialty Chems., Inc.* v. *Husisian*, 951 F. Supp. 2d 32, 39 (D.D.C. 2013) (quoting *Wexler* v. *United Air Lines, Inc.*, 496 F. Supp. 2d 150, 153 (D.D.C. 2007)).

17.     The question of how to apportion the cost to the defendant in cases seeking injunctive relief on behalf of a class of consumers is an open and recurring question within the D.C. Circuit.  District courts have employed the "non-aggregation" principle in CPPA suits when calculating the cost to the defendant of the injunctive relief.  *See Earth Island Inst.* v. *BlueTriton Brands*, --- F. Supp. 3d ----, 2022 WL 252031, at *3 (D.D.C. Jan. 27, 2022) (citing cases).  The non-aggregation principle provides that "separate and distinct claims of two or more plaintiffs cannot be aggregated in order to satisfy the jurisdictional amount requirement."  *Snyder* v. *Harris*, 394 U.S. 332, 335 (1969).  These courts have found that the cost of compliance with the injunctive relief should be divided by the number of affected consumers who could bring suit in their own right.  *See, e.g.*, *Organic Consumers Ass'n* v. *Handsome Brook Farm Grp. 2, LLC*, 222 F. Supp. 3d 74, 78 (D.D.C 2016); *Witte* v. *General Nutrition Corp.*, 104 F. Supp. 3d 1, 6 (D.D.C. 2015).[4]

---

[4]   To meet its statutory standing requirements for a suit brought under D.C. Code § 28-3905(k)(1)(D), Plaintiff must demonstrate that the consumers it purports to represent "could bring suit in their own right."  *Animal Legal Defense Fund* v. *Hormel Foods Corp.*, 258 A.3d 174, 183 (D.C. 2021).  In other words, the only consumers whose interests Plaintiff could represent in this case necessarily would be "consumers who have suffered a cognizable injury under the CPPA sufficient to give each of them Article III standing."  *Organic Consumers Ass'n*

The D.C. Circuit has not yet addressed the issue of "how the 'non-aggregation' and 'either viewpoint' doctrines interact." *Handsome Brook Farm*, 222 F. Supp. 3d at 79. Whether the Court assesses Bumble Bee's total cost of compliance or the individual cost to each affected consumer, the amount in controversy exceeds $75,000.

18.     In addition to the costs of compliance with injunctive relief, the amount in controversy also includes Plaintiff's separate request for "costs and disbursements, including reasonable attorneys' fees."  Compl. at 19, Prayer for Relief (c).  It is well established that attorneys' fees "may be counted towards establishing a jurisdictional amount when they are provided for by statute in controversy," *Parker-Williams* v. *Charles Tini & Assocs., Inc.*, 53 F. Supp. 3d 149, 153 (D.D.C. 2014) (cleaned up), as they are in the CPPA, *see* D.C. Code § 28-3905(k)(2)(B).  Indeed, attorneys' fee awards under the CPPA routinely exceed the $75,000 jurisdictional threshold on their own.  *See, e.g.*, *Williams* v. *First Gov't Mortg. & Inv'rs. Corp.*, 225 F.3d 738, 745–47 (D.C. Cir. 2000) ($199,340); *Beck* v. *Test Masters Educ. Servs., Inc.*, 73 F. Supp. 3d 12, 20 (D.D.C. 2014) ($854,623.90); *In re InPhonic, Inc.*, 674 F. Supp. 2d 273, 289 (D.D.C. 2009) ($453,885.31); *Dist. Cablevision L.P.* v. *Bassin*, 828 A.2d 714, 718 (D.C. 2003) ($425,916.25).

19.     Here, Plaintiff alleges that consumers are misled by certain statements in Bumble Bee's annual reports, website, and social media and seeks equitable relief that would compel Bumble Bee to modify its messages in those forums.  Compl. ¶ 17 (citing D.C. Code § 28-3905(k)(2)(D)).  Plaintiff also seeks "reasonable attorneys' fees." Compl. at 19, Prayer for Relief

---

v. *General Mills, Inc.,* No. 2016 CA 6309 B, 2017 WL 2901210, at *5 (D.C. Super. Ct. Apr. 27, 2017).

(c). The total value of complying with this injunctive relief and paying attorneys' fees would far exceed $75,000.

20.     **Injunctive Relief**.  Bumble Bee's total annual advertising budget is roughly $12 million, which includes social media.  Indeed, Bumble Bee's budget for social media alone has approached $2 million.  In addition to this annual advertising budget, Bumble Bee spends hundreds of thousands of dollars each year on corporate communications, reports, and website content— much of which is directed at the company's sustainability efforts.  Upon information and belief, an injunction directing Bumble Bee to revise and/or supplement its past and potentially future corporate reports, website content, and social media campaigns to satisfy Plaintiff's demands could easily reach into the millions of dollars.  In light of these substantial expenditures, it is more than plausible that Bumble's total cost of compliance with Plaintiff's requested relief would far exceed $75,000.[5]  *See Dart Cherokee*, 574 U.S. at 89.

21.     **Attorneys' Fees**.  As of 2017, Plaintiff's lead counsel, Kim Richman, has sought statutory attorneys' fees at $700.00 per hour.[6]  At that rate, the amount in controversy will exceed $75,000 so long as Mr. Richman *alone* bills just 110 hours to this litigation.[7]  Given the nature of

---

[5]   Bumble Bee does not concede—and in fact denies—that Plaintiff is entitled to any of the relief it seeks.  A plaintiff's claim "fixes the right of the defendant to remove" whether "well or ill-founded in fact."  *St. Paul Mercury Indem. Co.* v. *Red Cab Co.*, 303 U.S. 283, 294 (1938);  *see also* 14B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 3702.1 (4th ed. 2020) ("[A] defendant who seeks to prove that the amount in controversy is greater than the jurisdictional amount does not automatically concede that the jurisdictional amount is recoverable.").

[6]   *See* Decl. of Kim Richman in Supp. of Pls.' Mot. for Attorneys' Fees, Costs, & Incentive Awards ¶ 20, *Charvat* v. *Plymouth Rock Energy, LLC*, Civ. No. 15-4106 (E.D.N.Y. Oct. 5, 2017) (hereinafter, "Richman Decl.")

[7]   As of 2017, Mr. Richman's of counsel and associate each bill at $450.00 per hour.  *See* Richman Decl. ¶ 20.

Plaintiff's action, it is not only plausible, but highly probable that the attorneys' fees here will on their own exceed $75,000.

22.     Bumble Bee submits that the non-aggregation principle should not be applied here to reduce the cost of compliance with an injunction or attorneys' fees.  The non-aggregation principle is subject to an important exception.  It does not apply where "two or more plaintiffs unite to enforce a single title or right in which they have a common and undivided interest." *Snyder*, 394 U.S. at 335.  "[A] common and undivided claim exists when the adversary of the class has no interest in how the claim is to be distributed among the class members." *Nat'l Welfare Rights Org.* v. *Weinberger*, 377 F. Supp. 861, 866 (D.D.C. 1974); *Aetna U.S. Healthcare, Inc.* v. *Hoechst Aktiengesellschaft*, 48 F. Supp. 2d 37, 41 (D.D.C. 1999).  Plaintiff's claims meet this standard here because the cost of complying with Plaintiff's requested injunctive relief and paying attorneys' fees will "not be affected by the number of plaintiffs, nor by the values of their individual claims." *Williams* v. *Purdue Pharma Co.*, Civ. No. 02-0556, 2003 WL 24259557, at *5 (D.D.C. Feb. 27, 2003).  Unlike damages, the relief Plaintiff seeks—modification of Bumble Bee's advertising and attorneys' fees—cannot be distributed on a pro rata basis among a class of District of Columbia consumers.  *See In re Cardizem CD Antitrust Litig.*, 90 F. Supp. 2d 819, 835 (E.D. Mich. 1999) ("[W]here the plaintiff and the class members have a common and undivided interest in the injunctive relief, it is appropriate to aggregate the total cost of the requested injunctive relief from the defendant's viewpoint"); *Zuckman* v. *Monster Beverage Corp.*, 958 F. Supp. 2d 293, 301 (D.D.C. 2013) (noting that apportioning attorneys' fees between plaintiff "and the general public on a pro rata basis" would "underestimate the portion of fees properly attributed to" plaintiff).

23.     Even if the non-aggregation principle were to apply, the cost of compliance with the injunctive relief and attorneys' fees divided by the number of affected consumers in this case would still exceed $75,000.  Here, the number of consumers who actually viewed the statements at issue, and thus potentially could have brought suit in their own right, is miniscule.  For example, upon information and belief, the webpage hosting the 2020 Seafood Future Report received fewer than a dozen visits from IP addresses traceable to the District of Columbia from June 8, 2020 to June 8, 2021.  *See* Compl. ¶ 20, 22–24, 49, 62.  It is likely that even fewer bothered to open the report and read it.  Similarly, upon information and belief, Bumble Bee's Instagram account had only 19 followers from the District of Columbia on the day Bumble Bee posted about "World Ocean's Day."  Id. ¶ 26.  And again it is likely that even a smaller number actually viewed the "World Ocean's Day" post cited in the Complaint.  Upon information and belief, only about 15 percent of Bumble Bee's total followers (from any location) viewed the "World Ocean's Day" post on June 8, 2020, which suggests that the post was viewed by only a handful of individuals in the District of Columbia, at most.  Based on these estimates, it is likely that the actual number of D.C. consumers even potentially affected by the statements cited in the Complaint is quite small.[8]

24.     Dividing the substantial cost of compliance and attorneys' fees—which, as set forth above, could run into the millions of dollars—by the small number of affected consumers here would still result in an amount in controversy well over the $75,000 threshold.  *Compare Breakman* v. *AOL LLC*, 545 F. Supp. 2d 96, 100, 106 (D.D.C. 2008) (dividing AOL's cost of compliance of $255,800 by the 28,451 affected consumers, and holding that "the cost running to

---

[8]  A total of 479 non-followers also viewed the "World Ocean's Day" post, though Bumble Bee is not presently able to break down that figure by location.  Given that only 0.3 percent of Bumble Bee's total followers are from the District of Columbia, it is reasonable to infer that the same proportion of non-followers are located in the District.  That would suggest that only 2 non-followers in the District of Columbia viewed the post in question.

each District of Columbia consumer is $8.99, an amount far below the jurisdictional requirement"); *Hackman* v. *One Brands, LLC*, No. 18-2101 (CKK), 2019 WL 1440202, at *6 (D.D.C. Apr. 1, 2019) (dividing the defendant's costs of compliance by the 100 affected consumers for an apportioned cost of either $10,825 for rebranding or $1,300 for reformulation, "both of which fall below the jurisdictional requirement of $75,000").

25.    In sum, because the parties are "completely diverse," and the amount in controversy plausibly exceeds $75,000, this Court has subject matter jurisdiction under 28 U.S.C. § 1332(a).

**B.    This Court Also Has Jurisdiction Under the Class Action Fairness Act.**

26.    In the alternative, this Court has subject-matter jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because Plaintiff seeks to represent a class of District of Columbia consumers and CAFA's statutory requirements are satisfied.

27.    CAFA permits removal of (1) any "class action;" (2) where minimal diversity exists; (3) at least 100 class members are represented; and (4) "the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs." 28 U.S.C. § 1332(d)(1), (2), (5); *Bradford* v. *George Washington Univ.*, 249 F. Supp. 3d 325, 332 (D.D.C. 2017); *see also* 28 U.S.C. § 1453(b).  Each criterion is satisfied here.

28.    CAFA defines a "class action" as "any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action." 28 U.S.C. § 1332(d)(1)(B). CAFA's legislative history provides that "the definition of 'class action' is to be interpreted liberally.  Its application should not be confined solely to lawsuits that are labelled 'class actions.' Generally speaking, lawsuits that resemble a purported class action should be considered class actions for the purpose of applying these provisions." S. Rep. No. 109-14, at 35 (2005), *as*

*reprinted in* 2005 U.S.C.C.A.N. 3, 34 (formatting altered); *see also McMullen* v. *Synchrony Bank*, 82 F. Supp. 3d 133, 140 (D.D.C. 2015).  In other words, CAFA permits removal of a suit that is "in substance a class action" notwithstanding a plaintiff's "attempt to disguise the true nature of the suit." *Addison Automatics, Inc.* v. *Hartford Cas. Ins. Co.*, 731 F.3d 740, 742 (7th Cir. 2013); *see, e.g.*, *Williams* v. *Empl'rs Mut. Cas. Co.*, 845 F.3d 891, 901–02 (8th Cir. 2017); *Song* v. *Charter Commc'ns, Inc.*, Civ. No. 17-325, 2017 WL 1149286, at *1 n.1 (S.D. Cal. Mar. 28, 2017).

29.     This action is a putative "class action" under CAFA.  Plaintiff purports to bring this action "on behalf of the interests of a consumer or *a class of consumers*, . . . seeking relief from the use by any person of a trade practice in violation of a law of the District if the consumer or class could bring an action . . . for relief from such use by such person of such trade practice." Compl. ¶ 14 (emphasis added); *see also id.* ¶ 16 (noting that this is an action brought on behalf of "District consumers who purchase seafood and may be targeted by Bumble Bee's marketing claims.").  Plaintiff further represents that it "has a sufficient nexus to District consumers to adequately represent their interests." *Id.* ¶ 15.

30.     By filing a suit under D.C. Code § 28-3905(k)(1)(D)(i) and styling its action as a representative suit brought on behalf of a class of consumers, Plaintiff has chosen to bring what is in substance a putative class action:  a "representative suit on behalf of a group of persons similarly situated."     1  Alba  Conte  &  Herbert  B.  Newberg,  *Newberg  on  Class  Actions* § 1.1 (4th ed. 2002) (cleaned up).  While Plaintiff makes the self-serving assertion that "[n]o class certification will be requested," Compl. ¶ 16, actions like this one "that *resemble* a purported class action should be considered [a] class action for the purpose of applying [CAFA's] provisions," *Song*, 2017 WL 1149286, at *1 n.1 (emphasis added).  Indeed, the D.C. Court of Appeals has explained that such suits under the CPPA are necessarily subject to the "framework long

11

established by" D.C. Superior Court Rule of Civil Procedure 23, *Rotunda* v. *Marriot Int'l, Inc.*, 123 A.3d 980, 982 (D.C. 2015), which is in all relevant respects "identical" to Federal Rule of Civil Procedure 23, *see* D.C. Super. Ct. R. Civ. P. 23 cmt.[9]

31.     Minimal diversity is also more than satisfied here because complete diversity is in fact present.  Minimal diversity demands only that "any member of a class of plaintiffs" be "a citizen of a State different from any defendant."  28 U.S.C. § 1332(d)(2)(A).   The putative class of the District of Columbia consumers includes citizens of the District of Columbia.  Compl. ¶¶ 151–52.  By contrast, Bumble Bee is a citizen of Delaware where it is incorporated, and a citizen of California where it is headquartered.  *Id.* ¶ 64.

32.     As discussed above, Bumble Bee respectfully submits that the number of potentially affected consumers is quite small.  Should the Court determine otherwise, Bumble Bee argues, in the alternative, that the consumers on whose behalf Plaintiff sues exceeds 100 purported class members.   *See* 28 U.S.C. § 1332(d)(5)(B); Compl. ¶ 65 ("Bumble Bee's Products are available in a wide variety of national supermarket chains, regional stores, and other retail outlets, including stores in the District"); *id.* ¶ 73 ("Bumble Bee's Products can be, and are, purchased in the District by District consumers").[10]

---

[9]   Courts in this district have held that *Rotunda* applies only to CPPA cases seeking monetary damages, not injunctive relief.  *See, e.g.*, *Animal Legal Defense Fund* v. *Hormel Foods Corp.*, 249 F. Supp. 3d 53, 65 (D.D.C. 2017).  But *Rotunda* did not provide the D.C. Court of Appeals "with an opportunity to consider the 2012 amendments to the CPPA," which specifically added language to section 28-3905(k)(1)(D) "permitting public interest organizations to sue on behalf of a '*class*' of consumers."  *General Mills*, 2017 WL 2901210, at *4 (emphasis added). The effect of the 2012 amendments on the class certification requirement in *Rotunda* thus remains an open question.

[10]   *See also* Quick Facts: District of Columbia, U.S. Census Bureau (July 1, 2021), https://www.census.gov/quickfacts/DC (estimating the District of Columbia population at 670,050).

33.     Finally, given the cost to Bumble Bee of complying with Plaintiff's requested relief as described above, in addition to attorneys' fees, the amount in controversy exceeds the $5,000,000 threshold.  *See* 28 U.S.C. § 1332(d)(2).

## COMPLIANCE WITH PROCEDURAL REQUIREMENTS FOR REMOVAL

34.     Based on the foregoing, this Court has original jurisdiction over this action under 28 U.S.C. §§ 1332, 1441(b) (diversity jurisdiction), and 28 U.S.C. §§ 1332(d), 1453(b) (CAFA).

35.     The United States District Court for the District of Columbia is the appropriate venue for removal under 28 U.S.C. §1441(a) because the Superior Court of the District of Columbia, where this suit was originally filed, is within the District of Columbia.

36.     In accordance with 28 U.S.C. § 1446(a), a copy of all process, pleadings, and orders served upon Bumble Bee is attached as Exhibits A–E.

37.     Pursuant to 28 U.S.C. § 1446(d), Bumble Bee will promptly provide written notice of this filing to all adverse parties, and file a copy of this Notice of Removal with the clerk of the Superior Court of the District of Columbia.  A copy of this filing (without exhibits) is attached as Exhibit F.

38.     This Notice of Removal is signed pursuant to Fed. R. Civ. P. 11, as required by 28 U.S.C. § 1446(a).

39.     Bumble Bee reserves the right to amend or supplement this Notice of Removal. Bumble Bee also reserves all rights, defenses, and objections available under applicable law.  The filing of this Notice of Removal is subject to, and without waiver of, any such defenses or objections.

WHEREFORE, Bumble Bee respectfully gives notice that this action is hereby removed from the Superior Court of the District of Columbia to the United States District Court for the District of Columbia.


DATED:  May 2, 2022

Respectfully submitted,

By: /s/ *Justin Anderson*
Justin Anderson (D.C. Bar No. 1030572)
Jake E. Struebing (D.C. Bar No. 1673297)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street, NW
Washington, DC 20006
Telephone: (202) 223-7300
Facsimile:  (202) 223-7420
janderson@paulweiss.com
jstruebing@paulweiss.com

William Michael (*pro hac vice* forthcoming)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile:  (212) 757-3990
wmichael@paulweiss.com


*Attorneys for Defendant Bumble Bee Foods, LLC*

# EXHIBIT A

Filed
D.C. Superior Court
03/21/2022 15:21PM
Clerk of the Court

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

|  |  |
|---|---|
| INTERNATIONAL LABOR RIGHTS FORUM d/b/a GLOBAL LABOR JUSTICE-INTERNATIONAL LABOR RIGHTS FORUM, a non-profit corporation, 1634 I Street NW, Suite 1000 Washington, D.C. 20006 | ) ) ) ) ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| BUMBLE BEE FOODS, LLC 280 10th Avenue, San Diego, CA 92101 | ) ) ) ) |
| Defendant. | ) ) ) |

**COMPLAINT**

On behalf of itself and the general public, and in the interest of consumers, Plaintiff International Labor Rights Forum d/b/a Global Labor Justice–International Labor Rights Forum ("GLJ-ILRF") brings this action against Defendant Bumble Bee Foods, LLC ("Bumble Bee") concerning its false and deceptive marketing representations that its industrial tuna products are produced through a "fair and safe supply chain," despite significant evidence of forced labor and worker safety violations. GLJ-ILRF alleges the following based upon personal knowledge, information, and belief.

**INTRODUCTION**

1.     The use of fair labor practices and the promotion of worker safety is of growing concern to consumers.

2.     This is a consumer-protection case concerning deceptive marketing representations about Bumble Bee's tuna products (the "Products").[1] This case is brought by GLJ-ILRF, a non-profit, public-interest organization dedicated to fair labor practices, workers' rights, and consumer education. GLJ-ILRF seeks no monetary damages, only an end to the deceptive marketing and advertising at issue.

3.     Defendant Bumble Bee is one of the largest producers of canned tuna in the United States, which it markets under its name and various other brand names.

4.     In June 2020, Bumble Bee was acquired by FCF Co. Ltd. ("FCF"), a Taiwan-based seafood producer. Even before Bumble Bee was formally acquired by FCF, the company acquired between 70% and 95% of the tuna used in its major Products through FCF.[2]

5.     Most of the tuna produced through FCF's supply chain comes from fishing methods and regions recognized by U.S. government agencies as high risk for forced labor and other abuses.[3] Bumble Bee has thus long relied on FCF's supply chain and profited from the well-documented and endemic labor abuses therein.[4]

6.     Nevertheless, Bumble Bee makes marketing and advertising representations that convey to consumers, including consumers in the District of Columbia, that Bumble Bee is "best-in-class" in terms of its worker safety standards and that it is the company's "mission" to "champion sustainable fishing" throughout the Products supply chain.

---

[1] Discovery may reveal that additional Bumble Bee brands and products should be included within the scope of the allegations in this Complaint, and Plaintiff reserves the right to add such products.

[2] Declaration of Kent McNeil in Support of Chapter 11 Petitions and First-Day Motions at 50, *In re Bumble Bee Parent, Inc.*, No. 19-12502, 2020 Bankr. LEXIS 3369 (Bankr. D. Del. Dec. 1, 2020).

[3] *2020 List of Goods Produced by Child Labor or Forced Labor*, U.S. Department of Labor (Sept. 2020), https://www.dol.gov/sites/dolgov/files/ILAB/child_labor_reports/tda2019/2020_TVPRA_List_Online_Final.pdf.

[4] *Seafood Stewardship Index: FCF Co., Ltd.*, World Benchmarking Alliance, https://www.worldbenchmarkingalliance.org/publication/seafood-stewardship-index/companies/fcf-co/ (last visited Mar. 21, 2022).

WORKER SAFETY
We will continue to champion our best-in-class culture of safety in Bumble Bee
facilities to ensure adherence to established and thorough safety protocols. [5]

> Our purpose is to feed people's lives
> through the power of the ocean. It is
> our mission to champion sustainable
> fishing and advocate for fishers, setting
> tomorrow's standards through the
> actions we take today. [6]

7.      In reality, far from being "advocate[s]" for fishers, Bumble Bee and its supplier and

parent company FCF have a long history of engaging in and/or allowing unfair and dangerous

labor practices in the commercial fishing of the seafood that ends up in Bumble Bee Products.

Bumble Bee's supply chain not only falls short of international laws and standards regarding fair

labor practices, but also employs fishing methods that are inherently dangerous for workers. These

failures have resulted in documented instances of forced labor, human trafficking, and numerous

other violations of worker safety.

8.      Thus, Bumble Bee's marketing—which suggests that Bumble Bee is advocating

for fishers and that it is committed to a "fair and safe supply chain"—is false and misleading.

9.      Deceptive marketing representations that purport to ensure fair labor practices and

worker safety in fact **impede** meaningful efforts for change. As a market leader, Bumble Bee is

able to use its "fair and safe" claims to convince wide swaths of consumers that they can support

ethical practices without needing to change their purchasing habits, and to shut out advocacy

groups and competitors in efforts for genuine reform in commercial fishing. Indeed, Bumble Bee

---

[5] *Impact: Sustainability and Social Impact*, The Bumble Bee Seafood Company, https://thebumblebeecompany.com/impact/ (last visited Mar. 14, 2022).
   [6] *Id.*

developed its code of conduct with the Seafood Task Force, an industry-led group—ensuring that standards are set according to industry norms, instead of according to best practices.[7]

## STATUTORY FRAMEWORK

10.     This action is brought under the District of Columbia Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28-3901, *et seq.*

11.     The CPPA makes it a violation for "any person" to, *inter alia*:

Represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have;

Represent that goods or services are of a particular standard, quality, grade, style, or model, if in fact they are of another;

Misrepresent as to a material fact which has a tendency to mislead;

Fail to state a material fact if such failure tends to mislead;

Use innuendo or ambiguity as to a material fact, which has a tendency to mislead; or

Advertise or offer goods or services without the intent to sell them or without the intent to sell them as advertised or offered.

D.C. Code § 28-3904(a), (d), (e), (f), (f-1), (h).

12.     A violation occurs regardless of "whether or not any consumer is in fact misled, deceived or damaged thereby." *Id.*

13.     The CPPA "establishes an enforceable right to truthful information from merchants about consumer goods and services that are or would be purchased, leased, or received in the District of Columbia." *Id.* § 28-3901(c). It "shall be construed and applied liberally to promote its purpose." *Id.*

---

[7] Hannah Boles, *Tracking Progress: Assessing Business Responses to Forced Labour and Human Trafficking in the Thai Seafood Industry*, Praxis Labs, at 10–11 (2019), http://www.praxis-labs.com/uploads/2/9/7/0/29709145/09_hu_report_final.pdf.

14. Because GLJ-ILRF is a public-interest organization, it may act on behalf of the general public and bring any action that an individual consumer would be entitled to bring:

> [A] public interest organization may, on behalf of the interests of a consumer or a class of consumers, bring an action seeking relief from the use by any person of a trade practice in violation of a law of the District if the consumer or class could bring an action under subparagraph (A) of this paragraph for relief from such use by such person of such trade practice.

*Id.* § 28-3905(k)(1)(D)(i). Subparagraph (A) provides: "A consumer may bring an action seeking relief from the use of a trade practice in violation of a law of the District."

15. A public-interest organization may act on behalf of consumers, *i.e.*, the general public of the District of Columbia, so long as the organization has a "sufficient nexus to the interests involved of the consumer or class to adequately represent those interests." *Id.* § 28-3905(k)(1)(D)(ii). As set forth in this Complaint, *see infra* ¶¶ 66-69, Plaintiff GLJ-ILRF's mission is to advocate for workers and educate consumers on fair and safe labor practices, which it has long done within the District of Columbia. GLJ-ILRF thus has a sufficient nexus to District consumers to adequately represent their interests.

16. This is not a class action, or an action brought on behalf of any specific consumer, but an action brought by GLJ-ILRF on behalf of the general public, *i.e.*, District consumers who purchase seafood and may be targeted by Bumble Bee's marketing claims. No class certification will be requested.

17. This action does not seek damages. Instead, GLJ-ILRF seeks to end the unlawful conduct directed at District consumers. Remedies available under the CPPA include "[a]n injunction against the use of the unlawful trade practice." *Id.* § 28- 3905(k)(2)(D). GLJ-ILRF also seeks declaratory relief in the form of an order holding Bumble Bee's conduct to be unlawful.

## FACT ALLEGATIONS

**I.     Bumble Bee's Marketing Represents That its Labor Practices Are Fair and Safe.**

18.     Bumble Bee, one of America's largest producers of canned tuna products,[8] markets and advertises the Products in the District of Columbia. It seeks to reach the District consumer base online through its social media platforms, company websites, and other media.

19.     Bumble Bee's marketing targets consumers concerned with fair and safe supply chains by, among other things, making promises that its labor practices are "best-in-class."[9]

20.     Across its advertising, Bumble Bee makes representations that its labor practices are superlative. Bumble Bee leads consumers to believe that it leads the industry in upholding standards for fair and safe working conditions.



21.     On a webpage of Bumble Bee's website labeled "Sustainability & Social Impact," the company boasts that it is a "champion [for] sustainable fishing and advocate for fishers" and "committed to ensuring the safe treatment" of everyone in its supply chain.[11]

---

[8] Sam Bloch, *Bumble Bee, one of America's largest tuna companies, files for bankruptcy*, The Counter (Nov. 22, 2019), https://thecounter.org/bumble-bee-canned-tuna-bankruptcy-christopher-lischewski/.

[9] *Impact: Sustainability and Social Impact*, *supra* note 5.

[10]     *Seafood Future Report 2020*, The Bumble Bee Company, https://thebumblebeecompany.com/wp-content/uploads/2020/06/Bumble-Bee-Seafood-Future-Report_High-Res.pdf (last visited Mar. 14, 2022).

[11] *Impact: Sustainability and Social Impact*, *supra* note 5.

22.     Bumble Bee reiterates its commitment to "fair and responsible working conditions," as well as "sustainable livelihoods for workers," in its Seafood Future Report (the "Report").[12] The Report also emphasizes the importance of "the safety and well-being of all those who contribute" to Bumble Bee's supply chain.[13]

23.     In the Report, Bumble Bee states that it has "continued to lead the charge through [its] work as founders of the International Seafood Sustainability Foundation, [its] role in the world's first Fair Trade Certified fishery in Indonesia and [its] leadership driving longline tuna Fishery Improvement Projects."[14]

24.     Additionally, Bumble Bee promises to "Do[] good for [its] communities near and far," while also promising a "fair and safe supply chain."[15]

25.     Bumble Bee uses its social media accounts to reinforce its commitment to fair and safe working practices.

26.     For example, Bumble Bee's Instagram emphasizes its commitment to ensuring its workers' safety. In a post celebrating World Ocean's Day, the company wrote that it will "always advocate for [its] fishers and support [its] communities."[16]

---

[12] *Seafood Future Report 2020, supra* note 10.
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16]     Bumble Bee Seafoods (@bumblebeefoods), Instagram (Jun. 8, 2020), https://www.instagram.com/p/CBMZ5f0lSB5/.



27.     Bumble Bee also touts its commitment to promoting fair and safe working conditions by claiming that it requires its suppliers to comply with the Seafood Task Force Code of Conduct (the "Code") in order to maintain a relationship with the company.

## II.     Bumble Bee's Supply Chain Involves Unfair and Unsafe Commercial Fishing Practices.

28.     Contrary to Bumble Bee's representations, Bumble Bee and its parent company and supplier FCF engage in, and allow members of their supply chain to engage in, unfair and unsafe labor practices.

29.     Indeed, Bumble Bee and FCF's poor track record for labor practices is so well-documented that in September 2021, Greenpeace (with the backing of several other human rights organizations) lodged a Section 307 petition[18] with the U.S. Customs and Border Protection, requesting that the U.S. government investigate and possibly block the import of FCF seafood,

---

[17] Id.
[18] Section 307 of the U.S. Tariff Act of 1930, 19 U.S.C. § 1307, prohibits the entry into the United States of products manufactured through the use of forced labor.

including that imported under the Bumble Bee brand, to U.S. markets due to concerns over forced labor in the supply chain.[19]

30.     In commenting on the petition, Greenpeace stated:

> "For years, Greenpeace and other organizations have documented reports of destructive fishing practices and human rights abuses in FCF's supply chains. We're confident that there is enough reasonable suspicion that seafood traded by FCF and imported by Bumble Bee and other US companies is produced by forced labor."[20]

31.     The Section 307 petition reflects the long history of labor abuses in Bumble Bee's supply chain. This supply chain relies on fishing methods widely recognized as inherently prone to labor abuses. Far from being "best-in-class," the labor standards touted by Bumble Bee to address these issues fall far short of international standards. There is also a documented history of abuses and subpar working conditions in fishing vessels associated with the production of Bumble Bee's Products.[21]

32.     In short, Bumble Bee has repeatedly failed to actualize its claims that it prioritizes the fair treatment and safety of its laborers.

**A.      Bumble Bee's Supply Chain Employs Fishing Methods That are Inherently Unsafe.**

33.     The tuna in Bumble Bee's Products is sourced through "distant water fishing," a practice that involves vessels traveling long distances outside of their own nation's waters and that is recognized by the U.S. Customs and Border Protection as a practice at high risk for forced labor:

---

[19] *Organizations urge U.S. to block From Taiwanese seafood giant over forced labor concerns*, Greenpeace (Sept. 9, 2021), https://www.greenpeace.org/southeastasia/press/44640/organizations-urge-u-s-to-block-imports-from-taiwanese-seafood-giant-over-forced-labor-concerns/.
[20] *Id.*
[21] *Choppy Waters: Forced Labour and Illegal Fishing in Taiwan's Distant Water Fisheries*, Greenpeace (Mar. 19, 2020), https://www.greenpeace.org/usa/wp-content/uploads/2020/03/b87c6229-2020-choppy-waters-en.pdf.

"The distant water fishing industry is at high risk of forced labor as foreign companies often coerce vulnerable migrant workers to perform hazardous labor for little or no pay about distant water fishing vessels that may spend months at sea without making port calls."[22]

34.     Due to the migration habits of tuna, the tuna fishing industry particularly relies on distant water fishing, resulting in fleets that operate far from shore, unlike most other fishing vessels.[23]

35.     The long periods of time that such vessels spend at sea, without monitoring, inherently foster conditions that permit forced labor and other abuses to occur.[24] These harsh conditions typically fall to poor, indebted migrant workers who are unable to escape their situation due to the time at sea.[25]

36.     This risk is heightened by the practice of transshipment at sea, a process associated with distant water fishing and permitted by Bumble Bee, which requires an exchange of goods between ships while out at sea.[26] Transshipment has been highlighted by many organizations as an easy way for fishing vessels to commit human rights abuses because of lack of oversight.[27]

37.     Global Fishing Watch describes transshipment as a process involving floating unregulated ports that can "open the door" for "maritime crimes to take place, such as the trafficking of weapons, drugs, and even people."[28]

---

[22] *CBP Issues Withhold Release Order on Chinese Fishing Fleet*, U.S. Customs and Border Protection (May 28, 2021), https://www.cbp.gov/newsroom/national-media-release/cbp-issues-withhold-release-order-chinese-fishing-fleet.

[23] *Revealing the Supply Chain at Sea*, Global Fishing Watch (Apr. 2021), at 4, https://globalfishingwatch.org/wp-content/uploads/Revealing-the-Supply-Chain-at-Sea_FINAL_2021.pdf.

[24] *Id.* at 1.

[25] Andy Shen, *Why Bumble Bee Tuna Should Concern You (Hint: It's Human Rights and Destructive Fishing)*, Greenpeace (Mar. 19, 2020), https://www.greenpeace.org/usa/why-bumble-bee-tuna-should-concern-you-hint-its-human-rights-and-destructive-fishing/.

[26] *Id.*

[27] *Id.*

[28] *Transshipment*, Global Fishing Watch, https://globalfishingwatch.org/transshipment-success/#:~:text=Trouble%20with%20transshipment&text=It%20can%20enable%20fishers%20to,need%20to%20return%20to%20port (last visited Mar. 17, 2022).

38.     Transshipment can allow for the skirting labor and other regulations by transferring catches from vessels that may be denied access to ports due to past infringements and onto other boats, thus mixing legal and illegal catches.[29]

39.     In a submission to the World Trade Organization regarding concerns over forced labor in the fishing industry, the U.S. government noted that transshipment "enables a vessel to offload fish and receive fuel and supplies at sea, without returning to port for long periods of time, [which] may also allow vessels using forced labor to evade detection."[30]

40.     Bumble Bee's supply chain also practices "longline" fishing, a fishing technique that "requires backbreaking, dangerous, and relentless work."[31]

41.     Thus, Bumble Bee's representations that it is "best-in-class" in terms of fair and safe labor practices and that it is a "champion [for] sustainable fishing and advocate for fishers"[32] are contradicted by the inherent problems in Bumble Bee's fishing practices.

**B.     Bumble Bee Fails to Abide by Relevant International Laws and Standards Regarding Worker Safety and Fair Labor Practices.**

42.     Bumble Bee's worker safety policies and procedures outlined in the Code are based on a set of principles it developed with the Seafood Task Force—an industry-led, non-independent group.[33]

43.     Because the Code is designed to serve as an industry-wide set of minimum standards, followed by most of Bumble Bee's competitors,[34] Bumble Bee's adoption of the Code

---

[29] *Transshipment, supra* note 28, at 2.
[30] Office of the United States Trade Representative, *The Use of Forced Labor on Fishing Vessels: Submission of the United States* (May 26, 2021), https://ustr.gov/sites/default/files/IssueAreas/Trade%20Organizations/WTO/US.Proposal.Forced.Labor.26May2021.final%5B2%5D.pdf.
[31] Shen, *supra* note 25.
[32] *Impact: Sustainability and Social Impact, supra* note 5.
[33] Shen, *supra* note 25.
[34] *Current Members*, Seafood Task Force, https://www.seafoodtaskforce.global/about/current-members/ (last visited Mar. 17, 2022).

cannot be said to represent "best-in-class" standards or anything that would ensure uniquely "fair" or "safe" practices in Bumble Bee's supply chain.

44.     Moreover, these internal standards offer far less protection for workers than is available under international law.[35]

45.     The labor protections in the Code fall short of those set by the International Labor Organization's (the "ILO") Work in Fishing Convention.[36]

46.     For example, the policy of FCF, Bumble Bee's parent company and primary supplier, says only that crew must have "sufficient time to rest"—far short of the ILO's Work in Fishing Convention mandate that crew must have at least 10 hours of rest per day.[37]

47.     FCF also fails to prohibit widespread abusive practices like recruitment fees and repatriation deposits, which are used to financially burden poor, migrant workers.[38] In addition, FCF's requirements for regular pay only call for workers to be paid quarterly, as opposed to the ILO's Work in Fishing Convention's monthly payment mandate.[39]

48.     Even FCF's inadequate standards are largely unenforced, with only a minority of its long-term suppliers falling under the company's social auditing program,[40] and as many as 40% the vessels it sources from are free agents whose labor conditions FCF cannot control.[41] FCF does

---

[35] Shen, *supra* note 25. *See also* Taking Stock: Labor Exploitation, Illegal Fishing and Brand Irresponsibility in the Seafood Industry, ILRF, at 42 (May 2018), https://laborrights.org/sites/default/files/publications/Taking%20Stock%20final.pdf  and Helen Packer et al., *Corporate Social Responsibility (CSR) Practices of the Largest Seafood Suppliers in the Wild Capture Fisheries Sector: From Vision to Action*, 11 Sustainability 2254 (2019).

[36] *Choppy Waters*, *supra* note 21.

[37] *Id.*

[38] *Tuna Sustainability Policy*, FCF Co., Ltd. (Oct. 13, 2020), https://fcf.com.tw/wp-content/uploads/2021/07/FCF-Tuna-Sustainability-Policy_v3.0-101320-1-1.pdf .

[39] *Id.*

[40] *Company Update (Vol. 1): Social Responsibility Program*, FCF Co., Ltd. (Apr. 2020), https://fcf.com.tw/company-update-vol-1/.

[41] *Choppy Waters*, *supra* note 21.

not appear to have any formal process of identifying and addressing human rights risks among its suppliers.[42]

49.     Bumble Bee's own monitoring policies are also woefully insufficient, with Bumble Bee itself admitting in 2020 that it had only audited 30 supplier vessels.[43]

50.     Tragically, these policy failures are not just theoretical. They have enabled the dangerous, unfair, and abusive treatment of Bumble Bee's workers.

51.     In 2020, Greenpeace released a report[44] chronicling the abuse experienced by workers on board a supply ship employed by Bumble Bee and FCF,[45] Bumble Bee's parent company and supplier.  The report gave detailed accounts of 34-hour workdays, inadequate sleep, withheld wages, and little to no food.[46]

52.     These abusive conditions and reports of forced labor prompted the U.S. government to halt imports from that same Taiwan-based fishing vessel implicated in the Greenpeace report.[47]

53.     Neither Bumble Bee nor FCF disputed the connection to the Taiwanese fishing vessel.[48]

54.     Furthermore, the ILO also emphasizes the importance of regularly conducting audits of fishing vessels by trained and impartial observers to ensure fair and safe working

---

[42] *Seafood Stewardship Index, supra* note 4.
[43] *Seafood Future Report 2020, supra* note 10.
[44] *Choppy Waters, supra* note 21.
[45] Ben Fox, *US halts imports linked to Taiwan-based fishing vessel*, Associated Press (Aug. 20, 2020), https://apnews.com/article/0cb7aa0b2980d741ecc72e755e0ea852.
[46] *Choppy Waters, supra* note 21.
[47] Fox, *supra* note 45.
[48] *Id.*

conditions aboard fishing vessels.[49] These fishery observers risk their lives to provide oversight and protect workers.[50]

55.      Bumble Bee has failed to protect these fishery observers, and in so doing has failed to protect the safety of its workers.

56.      In March 2020, fisheries observer Eritara Aati Kaierua was reported dead by crewmembers working aboard Win Far No. 636, a Taiwanese-flagged tuna vessel associated with FCF.[51] Kaierua was employed through a regional observer program of the Western and Central Pacific Fisheries Commission ("WCPFC").  Many observers employed by WCPFC have reported instances of intimidation and requests by the crew to not report any observations.[52]

III.      **Bumble Bee's Representations Are Material and Misleading to Consumers.**

57.      Bumble Bee's false and misleading representations about its fair and safe labor practices are material to consumers.

58.      Consumers care deeply about human trafficking and other forms of forced labor in supply chains. A national survey found that 60% of consumers would stop using a product if they knew that human trafficking or forced labor was used to create it.[53]

59.      A majority of consumers would stop buying from brands that they believe are unethical. Moreover, 35% of consumers would stop buying from brands they perceive as unethical

---

[49] *Handbook on Improving living and working conditions on board fishing vessels*, International Labour Organization, https://www.ilo.org/wcmsp5/groups/public/---ed_dialogue/---sector/documents/publication/wcms_162323.pdf (last visited Mar. 17, 2022).

[50] *Observer Deaths and Disappearances*, Association for Professional Observers, https://www.apo-observers.org/misses (last visited Mar. 17, 2022).

[51] *Alleged Murdered Kiribati Fisheries Observer Family Left Without Financial Support*, Human Rights at Sea (June 8, 2020), https://www.humanrightsatsea.org/news/alleged-murdered-kiribati-fisheries-observer-family-left-without-financial-support/; *see also, UN intervention needed on suspected murder case linked to Bumble Bee Foods parent company*, Greenpeace (June 13, 2020), https://www.greenpeace.org/usa/news/un-intervention-needed-on-suspected-murder-case-linked-to-bumble-bee-foods-parent-company/.

[52] *Observer Deaths and Disappearances*, *supra* note 50.

[53] *Even If Consumers Aren't Aware of Human Trafficking, Companies Need to Be*, Enterra Solutions (Mar. 6, 2020), https://enterrasolutions.com/blog/even-if-consumers-arent-aware-of-human-trafficking-companies-need-to-be/.

even if there is no substitute is available.[54] Additionally, 63% of consumers feel that ethical issues are becoming more important.[55]

60.     Consumers are concerned with fairness and safety issues throughout the supply chain.

61.     A survey of 5,000 consumers showed that significant segments of the national consumer base prioritize "more transparency from food producers and retailers," "accountability and transparency through the entire food supply chain," and "fair treatment of workers."[56]

62.     Consumers expect, at a minimum, that the fair and safe labor practices outlined by Bumble Bee's Seafood Future Report or social media posts would be adhered to.

63.     Because there have been numerous documented reports of Bumble Bee's failure to provide fair and safe working conditions for its laborers (*see supra* Section II), and because Bumble Bee's labor standards fall far short of international expectations, its marketing of its Products as "best-in-class" in terms of worker safety and labor practices are misleading to consumers.

## PARTIES

64.     Defendant Bumble Bee Foods, LLC is incorporated in Delaware and has its principal executive office in San Diego, California. Bumble Bee produces, processes, markets, and distributes canned and pouch-packaged tuna products, meal kits, and snack products. As of June 2020, it is owned by FCF Co. Ltd., a Taiwanese seafood producer.

---

[54] *56% of Americans Stop Buying From Brands They Believe Are Unethical*, Mintel (Nov. 18, 2015), https://www.mintel.com/press-centre/social-and-lifestyle/56-of-americans-stop-buying-from-brands-they-believe-are-unethical.
[55] *Id.*
[56] *Consumer Survey Shows Changing Definition of Food Safety*, Food Safety News (Feb. 4, 2016), https://www.foodsafetynews.com/2016/02/123246/.

65.     Bumble Bee's Products are available in a wide variety of national supermarket chains, regional stores, and other retail outlets, including stores in the District.

66.     Plaintiff GLJ–ILRF is a § 501(c)(3) non-profit public-interest organization dedicated to achieving dignity and justice for workers worldwide. GLJ-ILRF focuses on enforcing labor rights and promoting decent work conditions consistent with best practices and ILO standards in the low-wage sections of global supply chains such as commercial fishing.  GLJ-ILRF engages in research, policy work, advocacy, and education of the public and consumers.

67.     A central part of GLJ-ILRF's work is to inform and educate the public, including consumers, about global supply chain business models that create patterns of harm to workers, including those working in commercial fishing.[57] Believing that "[c]onsumers have the right to know and the power to advance transparency and accountability,"[58] GLJ-ILRF "is working to make corporate global supply chains more transparent so consumers can use their dollars to stand with workers."[59] Historically, GLJ-ILRF has also published materials, like its "Shop With a Conscience" Consumer Guides, aimed at helping consumers shop ethically.[60]

68.     GLJ-ILRF also works to shed light on the falsity of various certification schemes in the seafood industry, which consumers rely on in making their purchases.[61] These include the

---

[57] *ILRF's key strategy for change is to strengthen the voices of workers and ensure they have access to justice*, ILRF, https://laborrights.org/strategies (last visited Mar. 17, 2022).

[58] *About*, ILRF, https://laborrights.org/about (last visited Mar. 17, 2022).

[59] *ILRF's key strategy, supra* note 57.

[60] *Shop with a Conscience Consumer Guide Launched*, ILRF (Nov. 17, 2009), https://laborrights.org/blog/200911/shop-conscience-consumer-guide-launched.

[61] "We [...] work to ensure consumers can depend on the integrity of labels and certifications that purport to guarantee decent working conditions for workers who make the products." *ILRF's key strategy, supra* note 57.

FISH Standard for Crew[62] and the Marine Stewardship Council's revised Chain of Custody Certification.[63]

69.    GLJ-ILRF works with unions, civil society, and high-level actors in global supply chains to achieve responsible business practices and meaningful change.[64] GLJ-ILRF coordinates the Seafood Working Group, a global coalition of human rights, labor and environmental organizations that work together to develop and advocate for effective government policies and industry actions to end the related problems of labor exploitation, illegal fishing and overfishing in the international seafood trade.[65]

## JURISDICTION AND VENUE

70.    This court has personal jurisdiction over the parties in this case. GLJ-ILRF performs its work throughout the United States, including the District of Columbia. GLJ-ILRF is registered as a nonprofit in the District of Columbia, and some of GLJ-ILRF's staff reside and work in or near the District.

71.    This Court has personal jurisdiction over Bumble Bee because Bumble Bee has purposefully directed its conduct to the district and has availed itself of the benefits and protections of District of Columbia law.

72.    The Court has subject matter jurisdiction over this action under the CPPA, D.C. § 28-3901, *et seq.*

---

[62] Seafood Working Group, *Retailers: The FISH Standard for Crew will fail to detect labor abuse*, ILRF (Apr. 20, 2021), https://laborrights.org/publications/retailers-fish-standard-crew-will-fail-detect-labor-abuse.

[63] *Public Statement on MSC's Revised Chain of Custody Certification*, ILRF (June 10, 2019), https://laborrights.org/publications/public-statement-mscs-revised-chain-custody-certification.

[64] Kimberly Rogovin, *Time for a Sea Change*, ILRF (Mar. 2020), https://laborrights.org/sites/default/files/publications/ILRF_TimeforaSeaChange.pdf.

[65] *Seafood Working Group*, ILRF, https://laborrights.org/industries/seafood?qt-quicktabs_seafood=3#qt-quicktabs_seafood (last visited Mar. 21, 2022).

73.     Venue is proper in this Court because Bumble Bee aims marketing and advertising material at consumers within the District. Bumble Bee internet advertising is accessible in the District. Bumble Bee's Products can be, and are, purchased in the District by District consumers.

## CAUSE OF ACTION

### *Violations of the District of Columbia Consumers Protection Procedures Act*

74.     GLJ-ILRF incorporates by reference all the allegations of the preceding paragraphs of this Complaint.

75.     GLJ-ILRF is a non-profit, public-interest organization that brings these claims on behalf of the general public and District consumers. *See* D.C. Code § 28-3905(k)(1)( D)(i).

76.     Through § 28-3905(k)(1)(C), the D.C. CPPA allows for non-profit organizational standing to the fullest extent recognized by the D.C. Court of Appeals in its past and future decisions addressing the limits of Constitutional standing under Article III.

77.     Through § 28-3905(k)(1)(D)(i), the D.C. CPPA explicitly allows for public-interest organizational standing even beyond that which is afforded pursuant to § 28-3905(k)(1)(C) and allows a public-interest organization to stand in the shoes of a consumer to seek relief from any violation of the CPPA.

78.     Bumble Bee is a "person" and a merchant that provides "goods" within the meaning of the CPPA. See *id.* § 28-3901(a)(1), (3), (7).

79.     Bumble Bee has advertised and marketed the Products with phrases such as "best-in-class culture of safety" and "fair and responsible working conditions," when, in fact, Bumble Bee sells tuna products caught by laborers who are subjected to inhuman conditions that do not meet the standards Bumble Bee set for itself. Thus, Bumble Bee has violated the CPPA by "represent[ing] that goods . . . have a source . . . [or] characteristics . . . that they do not have";

"represent[ing] that goods . . . are of a particular standard, quality, grade, style, or model, if in fact they are of another"; "misrepresent[ing] as to a material fact which has a tendency to mislead"; "fail[ing] to state a material fact if such failure tends to mislead"; "us[ing] innuendo or ambiguity as to a material fact, which has a tendency to mislead"; and "advertis[ing] . . . goods . . . without the intent to sell them as advertised." See *id.* § 28-3904(a), (d), (e), (f), (f-1), (h).

## JURY TRIAL DEMAND

80.    Plaintiff GLJ-ILRF hereby demands a trial by jury.

## PRAYER FOR RELIEF

*Wherefore*, Plaintiff GLJ-ILRF prays for judgment against Bumble Bee and requests the following relief:

a.    A declaration that Bumble Bee's conduct is in violation of the CPPA;

b.    An order enjoining Bumble Bee's conduct found to be in violation of the CPPA; and

c.    An order granting Plaintiff costs and disbursements, including reasonable attorneys' fees and expert fees, and prejudgment interest at the maximum rate allowable by law.

DATED: March 21, 2021

**RICHMAN LAW & POLICY**

Kim E. Richman (D.C. Bar No. 1022978)
Clark Binkley (pro hac vice forthcoming)
1 Bridge Street, Suite 83
Irvington, NY 10533
T: (718) 705-4579
krichman@richmanlawpolicy.com
cbinkley@richmanlawpolicy.com

19

# Superior Court of the District of Columbia

## CIVIL DIVISION- CIVIL ACTIONS BRANCH
### INFORMATION SHEET

INTERNATIONAL LABOR RIGHTS FORUM
d/b/a GLOBAL LABOR JUSTICE-INTERNATIONAL
LABOR RIGHTS FORUM

Case Number: _____

vs

Date: 3/21/2022 _____

BUMBLE BEE FOODS, LLC

☐ One of the defendants is being sued
in their official capacity.

| | |
|---|---|
| Name: *(Please Print)*<br>Kim E. Richman | Relationship to Lawsuit |
| Firm Name:<br>Richman Law & Policy | ☒ Attorney for Plaintiff |
| Telephone No.:          Six digit Unified Bar No.:<br>(718) 705-4579          1022978 | ☐ Self (Pro Se)<br>☐ Other: _____ |

TYPE OF CASE:  ☐ Non-Jury        ☐ 6 Person Jury        ☒ 12 Person Jury

Demand: $ N/A _____        Other: _____

PENDING CASE(S) RELATED TO THE ACTION BEING FILED
Case No.:_____   Judge: _____   Calendar #:_____

Case No.:_____   Judge: _____   Calendar#:_____

---

NATURE OF SUIT:      *(Check One Box Only)*

### A. CONTRACTS                              COLLECTION CASES

| | | |
|---|---|---|
| ☐ 01 Breach of Contract | ☐ 14 Under $25,000 Pltf. Grants Consent | ☐ 16 Under $25,000 Consent Denied |
| ☐ 02 Breach of Warranty | ☐ 17 OVER $25,000 Pltf. Grants Consent | ☐ 18 OVER $25,000 Consent Denied |
| ☐ 06 Negotiable Instrument | ☐ 27 Insurance/Subrogation | ☐ 26 Insurance/Subrogation |
| ☐ 07 Personal Property | Over $25,000 Pltf. Grants Consent | Over $25,000 Consent Denied |
| ☐ 13 Employment Discrimination | ☐ 07 Insurance/Subrogation | ☐ 34 Insurance/Subrogation |
| ☐ 15 Special Education Fees | Under $25,000 Pltf. Grants Consent | Under $25,000 Consent Denied |
| | ☐ 28 Motion to Confirm Arbitration | |
| | Award (Collection Cases Only) | |

### B. PROPERTY TORTS

| | | |
|---|---|---|
| ☐ 01 Automobile | ☐ 03 Destruction of Private Property | ☐ 05 Trespass |
| ☐ 02 Conversion | ☐ 04 Property Damage | |
| ☐ 07 Shoplifting, D.C. Code § 27-102 (a) | | |

### C. PERSONAL TORTS

| | | |
|---|---|---|
| ☐ 01 Abuse of Process | ☐ 10 Invasion of Privacy | ☐ 17 Personal Injury- (Not Automobile, Not Malpractice) |
| ☐ 02 Alienation of Affection | ☐ 11 Libel and Slander | ☐ 18 Wrongful Death (Not Malpractice) |
| ☐ 03 Assault and Battery | ☐ 12 Malicious Interference | ☐ 19 Wrongful Eviction |
| ☐ 04 Automobile- Personal Injury | ☐ 13 Malicious Prosecution | ☐ 20 Friendly Suit |
| ☒ 05 Deceit (Misrepresentation) | ☐ 14 Malpractice Legal | ☐ 21 Asbestos |
| ☐ 06 False Accusation | ☐ 15 Malpractice Medical (Including Wrongful Death) | ☐ 22 Toxic/Mass Torts |
| ☐ 07 False Arrest | ☐ 16 Negligence- (Not Automobile, Not Malpractice) | ☐ 23 Tobacco |
| ☐ 08 Fraud | | ☐ 24 Lead Paint |

SEE REVERSE SIDE AND CHECK HERE          IF USED

CV-496/June 2015

# Information Sheet, Continued

**C. OTHERS**

- ☐ 01 Accounting
- ☐ 02 Att. Before Judgment
- ☐ 05 Ejectment
- ☐ 09 Special Writ/Warrants
  (DC Code § 11-941)
- ☐ 10  Traffic Adjudication
- ☐ 11 Writ of Replevin
- ☐ 12 Enforce Mechanics Lien
- ☐ 16 Declaratory Judgment

- ☐ 17 Merit Personnel Act (OEA)
  (D.C. Code Title 1, Chapter 6)
- ☐ 18 Product Liability

- ☐ 24 Application to Confirm, Modify,
  Vacate Arbitration Award (DC Code § 16-4401)
- ☐ 29 Merit Personnel Act (OHR)
- ☐ 31 Housing Code Regulations
- ☐ 32 Qui Tam
- ☐ 33 Whistleblower

**II.**

- ☐ 03 Change of Name
- ☐ 06 Foreign Judgment/Domestic
- ☐ 08 Foreign Judgment/International
- ☐ 13 Correction of Birth Certificate
- ☐ 14 Correction of Marriage
  Certificate
- ☐ 26 Petition for Civil Asset Forfeiture (Vehicle)
- ☐ 27 Petition for Civil Asset Forfeiture (Currency)
- ☐ 28 Petition for Civil Asset Forfeiture (Other)

- ☐ 15 Libel of Information
- ☐ 19 Enter Administrative Order as
  Judgment [ D.C. Code §
  2-1802.03 (h) or 32-151 9 (a)]
- ☐ 20 Master Meter (D.C. Code §
  42-3301, et seq.)

- ☐ 21 Petition for Subpoena
  [Rule 28-I (b)]
- ☐ 22 Release Mechanics Lien
- ☐ 23 Rule 27(a)(1)
  (Perpetuate Testimony)
- ☐ 24 Petition for Structured Settlement
- ☐ 25 Petition for Liquidation

**D.  REAL PROPERTY**

- ☐ 09 Real Property-Real Estate
- ☐ 12 Specific Performance
- ☐ 04 Condemnation (Eminent Domain)
- ☐ 10 Mortgage Foreclosure/Judicial Sale
- ☐ 11 Petition for Civil Asset Forfeiture (RP)

- ☐ 08 Quiet Title
- ☐ 25 Liens: Tax / Water Consent Granted
- ☐ 30 Liens: Tax / Water Consent Denied
- ☐ 31 Tax Lien Bid Off Certificate Consent Granted

_____
Attorney's Signature

3/21/2022
_____
Date

# EXHIBIT B



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

International Labor Rights Forum dba Global Labor Justice - International Labor Rights Forum
_____
Plaintiff

vs.

Bumble Bee Foods, LLC                                          Case Number    2022 CA 001235 B
_____
Defendant

**SUMMONS**

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Kim E. Richman                                                   _Clerk of the Court_
_____
Name of Plaintiff's Attorney

1 Bridge St., Ste 83, Irvington, NY 10533              By _____
_____
Address                                                                   Deputy Clerk

(718) 705 - 4579                                              Date _____
_____
Telephone
如需翻译,请打电话 (202) 879-4828          Veuillez appeler au (202) 879-4828 pour une traduction          Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828로 전화주십시오          የአማርኛ ትርጉም ለማግኘት (202) 879-4828          ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
**Sección de Acciones Civiles**
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov

---

_____
Demandante

contra

Número de Caso: _____

_____
Demandado

### CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

_____          *SECRETARIO DEL TRIBUNAL*
Nombre del abogado del Demandante

_____          Por: _____
Dirección                                                                              Subsecretario

_____          Fecha _____
Teléfono

如需翻译，请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면 (202) 879-4828 로 전화주십시오         የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, _NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO_.

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

# EXHIBIT C

Filed
D.C. Superior Court
03/28/2022 18:21PM
Clerk of the Court

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

|  |  |
|---|---|
| INTERNATIONAL LABOR RIGHTS FORUM d/b/a GLOBAL LABOR JUSTICE-INTERNATIONAL LABOR RIGHTS FORUM, a non-profit corporation, 1634 I Street NW, Suite 1000 Washington, D.C. 20006 | **2022 CA 001235 B** |
| Plaintiff, |  |
| v. |  |
| BUMBLE BEE FOODS, LLC 280 10th Avenue, San Diego, CA 92101 |  |
| Defendant. |  |

## COMPLAINT

On behalf of itself and the general public, and in the interest of consumers, Plaintiff International Labor Rights Forum d/b/a Global Labor Justice–International Labor Rights Forum ("GLJ-ILRF") brings this action against Defendant Bumble Bee Foods, LLC ("Bumble Bee") concerning its false and deceptive marketing representations that its industrial tuna products are produced through a "fair and safe supply chain," despite significant evidence of forced labor and worker safety violations. GLJ-ILRF alleges the following based upon personal knowledge, information, and belief.

## INTRODUCTION

1.     The use of fair labor practices and the promotion of worker safety is of growing concern to consumers.

2.      This is a consumer-protection case concerning deceptive marketing representations about Bumble Bee's tuna products (the "Products").[1] This case is brought by GLJ-ILRF, a non-profit, public-interest organization dedicated to fair labor practices, workers' rights, and consumer education. GLJ-ILRF seeks no monetary damages, only an end to the deceptive marketing and advertising at issue.

3.      Defendant Bumble Bee is one of the largest producers of canned tuna in the United States, which it markets under its name and various other brand names.

4.      In June 2020, Bumble Bee was acquired by FCF Co. Ltd. ("FCF"), a Taiwan-based seafood producer. Even before Bumble Bee was formally acquired by FCF, the company acquired between 70% and 95% of the tuna used in its major Products through FCF.[2]

5.      Most of the tuna produced through FCF's supply chain comes from fishing methods and regions recognized by U.S. government agencies as high risk for forced labor and other abuses.[3] Bumble Bee has thus long relied on FCF's supply chain and profited from the well-documented and endemic labor abuses therein.[4]

6.      Nevertheless, Bumble Bee makes marketing and advertising representations that convey to consumers, including consumers in the District of Columbia, that Bumble Bee is "best-in-class" in terms of its worker safety standards and that it is the company's "mission" to "champion sustainable fishing" throughout the Products supply chain.

---

[1] Discovery may reveal that additional Bumble Bee brands and products should be included within the scope of the allegations in this Complaint, and Plaintiff reserves the right to add such products.

[2] Declaration of Kent McNeil in Support of Chapter 11 Petitions and First-Day Motions at 50, *In re Bumble Bee Parent, Inc.*, No. 19-12502, 2020 Bankr. LEXIS 3369 (Bankr. D. Del. Dec. 1, 2020).

[3] *2020 List of Goods Produced by Child Labor or Forced Labor*, U.S. Department of Labor (Sept. 2020), https://www.dol.gov/sites/dolgov/files/ILAB/child_labor_reports/tda2019/2020_TVPRA_List_Online_Final.pdf.

[4] *Seafood Stewardship Index: FCF Co., Ltd.*, World Benchmarking Alliance, https://www.worldbenchmarkingalliance.org/publication/seafood-stewardship-index/companies/fcf-co/ (last visited Mar. 21, 2022).

WORKER SAFETY
We will continue to champion our best-in-class culture of safety in Bumble Bee
facilities to ensure adherence to established and thorough safety protocols.[5]

> Our purpose is to feed people's lives
> through the power of the ocean. It is
> our mission to champion sustainable
> fishing and advocate for fishers, setting
> tomorrow's standards through the
> actions we take today.[6]

7.      In reality, far from being "advocate[s]" for fishers, Bumble Bee and its supplier and

parent company FCF have a long history of engaging in and/or allowing unfair and dangerous

labor practices in the commercial fishing of the seafood that ends up in Bumble Bee Products.

Bumble Bee's supply chain not only falls short of international laws and standards regarding fair

labor practices, but also employs fishing methods that are inherently dangerous for workers. These

failures have resulted in documented instances of forced labor, human trafficking, and numerous

other violations of worker safety.

8.      Thus, Bumble Bee's marketing—which suggests that Bumble Bee is advocating

for fishers and that it is committed to a "fair and safe supply chain"—is false and misleading.

9.      Deceptive marketing representations that purport to ensure fair labor practices and

worker safety in fact *impede* meaningful efforts for change. As a market leader, Bumble Bee is

able to use its "fair and safe" claims to convince wide swaths of consumers that they can support

ethical practices without needing to change their purchasing habits, and to shut out advocacy

groups and competitors in efforts for genuine reform in commercial fishing. Indeed, Bumble Bee

---

[5]  *Impact: Sustainability and Social Impact*, The Bumble Bee Seafood Company,
https://thebumblebeecompany.com/impact/ (last visited Mar. 14, 2022).
[6]  *Id.*

3

developed its code of conduct with the Seafood Task Force, an industry-led group—ensuring that standards are set according to industry norms, instead of according to best practices.[7]

## STATUTORY FRAMEWORK

10.     This action is brought under the District of Columbia Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28-3901, *et seq.*

11.     The CPPA makes it a violation for "any person" to, *inter alia*:

Represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have;

Represent that goods or services are of a particular standard, quality, grade, style, or model, if in fact they are of another;

Misrepresent as to a material fact which has a tendency to mislead;

Fail to state a material fact if such failure tends to mislead;

Use innuendo or ambiguity as to a material fact, which has a tendency to mislead; or

Advertise or offer goods or services without the intent to sell them or without the intent to sell them as advertised or offered.

D.C. Code § 28-3904(a), (d), (e), (f), (f-1), (h).

12.     A violation occurs regardless of "whether or not any consumer is in fact misled, deceived or damaged thereby." *Id.*

13.     The CPPA "establishes an enforceable right to truthful information from merchants about consumer goods and services that are or would be purchased, leased, or received in the District of Columbia." *Id.* § 28-3901(c). It "shall be construed and applied liberally to promote its purpose." *Id.*

---

[7] Hannah Boles, *Tracking Progress: Assessing Business Responses to Forced Labour and Human Trafficking in the Thai Seafood Industry*, Praxis Labs, at 10–11 (2019), http://www.praxis-labs.com/uploads/2/9/7/0/29709145/09_hu_report_final.pdf.

14.     Because GLJ-ILRF is a public-interest organization, it may act on behalf of the general public and bring any action that an individual consumer would be entitled to bring:

> [A] public interest organization may, on behalf of the interests of a consumer or a class of consumers, bring an action seeking relief from the use by any person of a trade practice in violation of a law of the District if the consumer or class could bring an action under subparagraph (A) of this paragraph for relief from such use by such person of such trade practice.

*Id.* § 28-3905(k)(1)(D)(i). Subparagraph (A) provides: "A consumer may bring an action seeking relief from the use of a trade practice in violation of a law of the District."

15.     A public-interest organization may act on behalf of consumers, *i.e.*, the general public of the District of Columbia, so long as the organization has a "sufficient nexus to the interests involved of the consumer or class to adequately represent those interests." *Id.* § 28-3905(k)(1)(D)(ii). As set forth in this Complaint, *see infra* ¶¶ 66-69, Plaintiff GLJ-ILRF's mission is to advocate for workers and educate consumers on fair and safe labor practices, which it has long done within the District of Columbia. GLJ-ILRF thus has a sufficient nexus to District consumers to adequately represent their interests.

16.     This is not a class action, or an action brought on behalf of any specific consumer, but an action brought by GLJ-ILRF on behalf of the general public, *i.e.*, District consumers who purchase seafood and may be targeted by Bumble Bee's marketing claims. No class certification will be requested.

17.     This action does not seek damages. Instead, GLJ-ILRF seeks to end the unlawful conduct directed at District consumers. Remedies available under the CPPA include "[a]n injunction against the use of the unlawful trade practice." *Id.* § 28- 3905(k)(2)(D). GLJ-ILRF also seeks declaratory relief in the form of an order holding Bumble Bee's conduct to be unlawful.

## FACT ALLEGATIONS

**I.     Bumble Bee's Marketing Represents That its Labor Practices Are Fair and Safe.**

18.     Bumble Bee, one of America's largest producers of canned tuna products,[8] markets and advertises the Products in the District of Columbia. It seeks to reach the District consumer base online through its social media platforms, company websites, and other media.

19.     Bumble Bee's marketing targets consumers concerned with fair and safe supply chains by, among other things, making promises that its labor practices are "best-in-class."[9]

20.     Across its advertising, Bumble Bee makes representations that its labor practices are superlative. Bumble Bee leads consumers to believe that it leads the industry in upholding standards for fair and safe working conditions.



21.     On a webpage of Bumble Bee's website labeled "Sustainability & Social Impact," the company boasts that it is a "champion [for] sustainable fishing and advocate for fishers" and "committed to ensuring the safe treatment" of everyone in its supply chain.[11]

---

[8] Sam Bloch, *Bumble Bee, one of America's largest tuna companies, files for bankruptcy*, The Counter (Nov. 22, 2019), https://thecounter.org/bumble-bee-canned-tuna-bankruptcy-christopher-lischewski/.

[9] *Impact: Sustainability and Social Impact*, *supra* note 5.

[10] *Seafood Future Report 2020*, The Bumble Bee Company, https://thebumblebeecompany.com/wp-content/uploads/2020/06/Bumble-Bee-Seafood-Future-Report_High-Res.pdf (last visited Mar. 14, 2022).

[11] *Impact: Sustainability and Social Impact*, *supra* note 5.

22.     Bumble Bee reiterates its commitment to "fair and responsible working conditions," as well as "sustainable livelihoods for workers," in its Seafood Future Report (the "Report").[12] The Report also emphasizes the importance of "the safety and well-being of all those who contribute" to Bumble Bee's supply chain.[13]

23.     In the Report, Bumble Bee states that it has "continued to lead the charge through [its] work as founders of the International Seafood Sustainability Foundation, [its] role in the world's first Fair Trade Certified fishery in Indonesia and [its] leadership driving longline tuna Fishery Improvement Projects."[14]

24.     Additionally, Bumble Bee promises to "Do[] good for [its] communities near and far," while also promising a "fair and safe supply chain."[15]

25.     Bumble Bee uses its social media accounts to reinforce its commitment to fair and safe working practices.

26.     For example, Bumble Bee's Instagram emphasizes its commitment to ensuring its workers' safety. In a post celebrating World Ocean's Day, the company wrote that it will "always advocate for [its] fishers and support [its] communities."[16]

---

[12] *Seafood Future Report 2020*, *supra* note 10.
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16]     Bumble Bee Seafoods (@bumblebeefoods), Instagram (Jun. 8, 2020), https://www.instagram.com/p/CBMZ5f0lSB5/.



27.     Bumble Bee also touts its commitment to promoting fair and safe working conditions by claiming that it requires its suppliers to comply with the Seafood Task Force Code of Conduct (the "Code") in order to maintain a relationship with the company.

## II.     Bumble Bee's Supply Chain Involves Unfair and Unsafe Commercial Fishing Practices.

28.     Contrary to Bumble Bee's representations, Bumble Bee and its parent company and supplier FCF engage in, and allow members of their supply chain to engage in, unfair and unsafe labor practices.

29.     Indeed, Bumble Bee and FCF's poor track record for labor practices is so well-documented that in September 2021, Greenpeace (with the backing of several other human rights organizations) lodged a Section 307 petition[18] with the U.S. Customs and Border Protection, requesting that the U.S. government investigate and possibly block the import of FCF seafood,

---

[17] Id.

[18] Section 307 of the U.S. Tariff Act of 1930, 19 U.S.C. § 1307, prohibits the entry into the United States of products manufactured through the use of forced labor.

including that imported under the Bumble Bee brand, to U.S. markets due to concerns over forced labor in the supply chain.[19]

30.      In commenting on the petition, Greenpeace stated:

> "For years, Greenpeace and other organizations have documented reports of destructive fishing practices and human rights abuses in FCF's supply chains. We're confident that there is enough reasonable suspicion that seafood traded by FCF and imported by Bumble Bee and other US companies is produced by forced labor."[20]

31.      The Section 307 petition reflects the long history of labor abuses in Bumble Bee's supply chain. This supply chain relies on fishing methods widely recognized as inherently prone to labor abuses. Far from being "best-in-class," the labor standards touted by Bumble Bee to address these issues fall far short of international standards. There is also a documented history of abuses and subpar working conditions in fishing vessels associated with the production of Bumble Bee's Products.[21]

32.      In short, Bumble Bee has repeatedly failed to actualize its claims that it prioritizes the fair treatment and safety of its laborers.

**A.      Bumble Bee's Supply Chain Employs Fishing Methods That are Inherently Unsafe.**

33.      The tuna in Bumble Bee's Products is sourced through "distant water fishing," a practice that involves vessels traveling long distances outside of their own nation's waters and that is recognized by the U.S. Customs and Border Protection as a practice at high risk for forced labor:

---

[19] *Organizations urge U.S. to block From Taiwanese seafood giant over forced labor concerns*, Greenpeace (Sept. 9, 2021), https://www.greenpeace.org/southeastasia/press/44640/organizations-urge-u-s-to-block-imports-from-taiwanese-seafood-giant-over-forced-labor-concerns/.

[20] *Id.*

[21] *Choppy Waters: Forced Labour and Illegal Fishing in Taiwan's Distant Water Fisheries*, Greenpeace (Mar. 19, 2020), https://www.greenpeace.org/usa/wp-content/uploads/2020/03/b87c6229-2020-choppy-waters-en.pdf.

> "The distant water fishing industry is at high risk of forced labor as foreign companies often coerce vulnerable migrant workers to perform hazardous labor for little or no pay about distant water fishing vessels that may spend months at sea without making port calls."[22]

34.     Due to the migration habits of tuna, the tuna fishing industry particularly relies on distant water fishing, resulting in fleets that operate far from shore, unlike most other fishing vessels.[23]

35.     The long periods of time that such vessels spend at sea, without monitoring, inherently foster conditions that permit forced labor and other abuses to occur.[24] These harsh conditions typically fall to poor, indebted migrant workers who are unable to escape their situation due to the time at sea.[25]

36.     This risk is heightened by the practice of transshipment at sea, a process associated with distant water fishing and permitted by Bumble Bee, which requires an exchange of goods between ships while out at sea.[26] Transshipment has been highlighted by many organizations as an easy way for fishing vessels to commit human rights abuses because of lack of oversight.[27]

37.     Global Fishing Watch describes transshipment as a process involving floating unregulated ports that can "open the door" for "maritime crimes to take place, such as the trafficking of weapons, drugs, and even people."[28]

---

[22] *CBP Issues Withhold Release Order on Chinese Fishing Fleet*, U.S. Customs and Border Protection (May 28, 2021), https://www.cbp.gov/newsroom/national-media-release/cbp-issues-withhold-release-order-chinese-fishing-fleet.

[23] *Revealing the Supply Chain at Sea*, Global Fishing Watch (Apr. 2021), at 4, https://globalfishingwatch.org/wp-content/uploads/Revealing-the-Supply-Chain-at-Sea_FINAL_2021.pdf.

[24] *Id.* at 1.

[25] Andy Shen, *Why Bumble Bee Tuna Should Concern You (Hint: It's Human Rights and Destructive Fishing)*, Greenpeace (Mar. 19, 2020), https://www.greenpeace.org/usa/why-bumble-bee-tuna-should-concern-you-hint-its-human-rights-and-destructive-fishing/.

[26] *Id.*

[27] *Id.*

[28] *Transshipment*, Global Fishing Watch, https://globalfishingwatch.org/transshipment-success/#:~:text=Trouble%20with%20transshipment&text=It%20can%20enable%20fishers%20to,need%20to%20return%20to%20port (last visited Mar. 17, 2022).

38.     Transshipment can allow for the skirting labor and other regulations by transferring catches from vessels that may be denied access to ports due to past infringements and onto other boats, thus mixing legal and illegal catches.[29]

39.     In a submission to the World Trade Organization regarding concerns over forced labor in the fishing industry, the U.S. government noted that transshipment "enables a vessel to offload fish and receive fuel and supplies at sea, without returning to port for long periods of time, [which] may also allow vessels using forced labor to evade detection."[30]

40.     Bumble Bee's supply chain also practices "longline" fishing, a fishing technique that "requires backbreaking, dangerous, and relentless work."[31]

41.     Thus, Bumble Bee's representations that it is "best-in-class" in terms of fair and safe labor practices and that it is a "champion [for] sustainable fishing and advocate for fishers"[32] are contradicted by the inherent problems in Bumble Bee's fishing practices.

**B.      Bumble Bee Fails to Abide by Relevant International Laws and Standards Regarding Worker Safety and Fair Labor Practices.**

42.     Bumble Bee's worker safety policies and procedures outlined in the Code are based on a set of principles it developed with the Seafood Task Force—an industry-led, non-independent group.[33]

43.     Because the Code is designed to serve as an industry-wide set of minimum standards, followed by most of Bumble Bee's competitors,[34] Bumble Bee's adoption of the Code

---

[29] *Transshipment, supra* note 28, at 2.
[30] Office of the United States Trade Representative, *The Use of Forced Labor on Fishing Vessels: Submission of the                United                States* (May          26,          2021), https://ustr.gov/sites/default/files/IssueAreas/Trade%20Organizations/WTO/US.Proposal.Forced.Labor.26May2021. final%5B2%5D.pdf.
[31] Shen, *supra* note 25.
[32] *Impact: Sustainability and Social Impact, supra* note 5.
[33] Shen, *supra* note 25.
[34] *Current Members*, Seafood Task Force, https://www.seafoodtaskforce.global/about/current-members/ (last visited Mar. 17, 2022).

cannot be said to represent "best-in-class" standards or anything that would ensure uniquely "fair" or "safe" practices in Bumble Bee's supply chain.

44.     Moreover, these internal standards offer far less protection for workers than is available under international law.[35]

45.     The labor protections in the Code fall short of those set by the International Labor Organization's (the "ILO") Work in Fishing Convention.[36]

46.     For example, the policy of FCF, Bumble Bee's parent company and primary supplier, says only that crew must have "sufficient time to rest"—far short of the ILO's Work in Fishing Convention mandate that crew must have at least 10 hours of rest per day.[37]

47.     FCF also fails to prohibit widespread abusive practices like recruitment fees and repatriation deposits, which are used to financially burden poor, migrant workers.[38] In addition, FCF's requirements for regular pay only call for workers to be paid quarterly, as opposed to the ILO's Work in Fishing Convention's monthly payment mandate.[39]

48.     Even FCF's inadequate standards are largely unenforced, with only a minority of its long-term suppliers falling under the company's social auditing program,[40] and as many as 40% the vessels it sources from are free agents whose labor conditions FCF cannot control.[41] FCF does

---

[35] Shen, *supra* note 25. *See also* Taking Stock: Labor Exploitation, Illegal Fishing and Brand Irresponsibility in the Seafood Industry, ILRF, at 42 (May 2018), https://laborrights.org/sites/default/files/publications/Taking%20Stock%20final.pdf and Helen Packer et al., *Corporate Social Responsibility (CSR) Practices of the Largest Seafood Suppliers in the Wild Capture Fisheries Sector: From Vision to Action*, 11 Sustainability 2254 (2019).
[36] *Choppy Waters, supra* note 21.
[37] *Id.*
[38] *Tuna Sustainability Policy*, FCF Co., Ltd. (Oct. 13, 2020), https://fcf.com.tw/wp-content/uploads/2021/07/FCF-Tuna-Sustainability-Policy_v3.0-101320-1-1.pdf .
[39] *Id.*
[40] *Company Update (Vol. 1): Social Responsibility Program*, FCF Co., Ltd. (Apr. 2020), https://fcf.com.tw/company-update-vol-1/.
[41] *Choppy Waters, supra* note 21.

not appear to have any formal process of identifying and addressing human rights risks among its suppliers.[42]

49.     Bumble Bee's own monitoring policies are also woefully insufficient, with Bumble Bee itself admitting in 2020 that it had only audited 30 supplier vessels.[43]

50.     Tragically, these policy failures are not just theoretical. They have enabled the dangerous, unfair, and abusive treatment of Bumble Bee's workers.

51.     In 2020, Greenpeace released a report[44] chronicling the abuse experienced by workers on board a supply ship employed by Bumble Bee and FCF,[45] Bumble Bee's parent company and supplier.  The report gave detailed accounts of 34-hour workdays, inadequate sleep, withheld wages, and little to no food.[46]

52.     These abusive conditions and reports of forced labor prompted the U.S. government to halt imports from that same Taiwan-based fishing vessel implicated in the Greenpeace report.[47]

53.     Neither Bumble Bee nor FCF disputed the connection to the Taiwanese fishing vessel.[48]

54.     Furthermore, the ILO also emphasizes the importance of regularly conducting audits of fishing vessels by trained and impartial observers to ensure fair and safe working

---

[42] *Seafood Stewardship Index*, *supra* note 4.

[43] *Seafood Future Report 2020*, *supra* note 10.

[44] *Choppy Waters*, *supra* note 21.

[45] Ben Fox, *US halts imports linked to Taiwan-based fishing vessel*, Associated Press (Aug. 20, 2020), https://apnews.com/article/0cb7aa0b2980d741ecc72e755e0ea852.

[46] *Choppy Waters*, *supra* note 21.

[47] Fox, *supra* note 45.

[48] *Id.*

conditions aboard fishing vessels.[49] These fishery observers risk their lives to provide oversight and protect workers.[50]

55.     Bumble Bee has failed to protect these fishery observers, and in so doing has failed to protect the safety of its workers.

56.     In March 2020, fisheries observer Eritara Aati Kaierua was reported dead by crewmembers working aboard Win Far No. 636, a Taiwanese-flagged tuna vessel associated with FCF.[51] Kaierua was employed through a regional observer program of the Western and Central Pacific Fisheries Commission ("WCPFC").  Many observers employed by WCPFC have reported instances of intimidation and requests by the crew to not report any observations.[52]

**III.     Bumble Bee's Representations Are Material and Misleading to Consumers.**

57.     Bumble Bee's false and misleading representations about its fair and safe labor practices are material to consumers.

58.     Consumers care deeply about human trafficking and other forms of forced labor in supply chains. A national survey found that 60% of consumers would stop using a product if they knew that human trafficking or forced labor was used to create it.[53]

59.     A majority of consumers would stop buying from brands that they believe are unethical. Moreover, 35% of consumers would stop buying from brands they perceive as unethical

---

[49] *Handbook on Improving living and working conditions on board fishing vessels*, International Labour Organization, https://www.ilo.org/wcmsp5/groups/public/---ed_dialogue/---sector/documents/publication/wcms_162323.pdf (last visited Mar. 17, 2022).

[50] *Observer Deaths and Disappearances*, Association for Professional Observers, https://www.apo-observers.org/misses (last visited Mar. 17, 2022).

[51] *Alleged Murdered Kiribati Fisheries Observer Family Left Without Financial Support*, Human Rights at Sea (June 8, 2020), https://www.humanrightsatsea.org/news/alleged-murdered-kiribati-fisheries-observer-family-left-without-financial-support/; *see also, UN intervention needed on suspected murder case linked to Bumble Bee Foods parent company*, Greenpeace (June 13, 2020), https://www.greenpeace.org/usa/news/un-intervention-needed-on-suspected-murder-case-linked-to-bumble-bee-foods-parent-company/.

[52] *Observer Deaths and Disappearances*, *supra* note 50.

[53] *Even If Consumers Aren't Aware of Human Trafficking, Companies Need to Be*, Enterra Solutions (Mar. 6, 2020), https://enterrasolutions.com/blog/even-if-consumers-arent-aware-of-human-trafficking-companies-need-to-be/.

even if there is no substitute is available.[54] Additionally, 63% of consumers feel that ethical issues are becoming more important.[55]

60.     Consumers are concerned with fairness and safety issues throughout the supply chain.

61.     A survey of 5,000 consumers showed that significant segments of the national consumer base prioritize "more transparency from food producers and retailers," "accountability and transparency through the entire food supply chain," and "fair treatment of workers."[56]

62.     Consumers expect, at a minimum, that the fair and safe labor practices outlined by Bumble Bee's Seafood Future Report or social media posts would be adhered to.

63.     Because there have been numerous documented reports of Bumble Bee's failure to provide fair and safe working conditions for its laborers (*see supra* Section II), and because Bumble Bee's labor standards fall far short of international expectations, its marketing of its Products as "best-in-class" in terms of worker safety and labor practices are misleading to consumers.

**PARTIES**

64.     Defendant Bumble Bee Foods, LLC is incorporated in Delaware and has its principal executive office in San Diego, California. Bumble Bee produces, processes, markets, and distributes canned and pouch-packaged tuna products, meal kits, and snack products. As of June 2020, it is owned by FCF Co. Ltd., a Taiwanese seafood producer.

---

[54] *56% of Americans Stop Buying From Brands They Believe Are Unethical*, Mintel (Nov. 18, 2015), https://www.mintel.com/press-centre/social-and-lifestyle/56-of-americans-stop-buying-from-brands-they-believe-are-unethical.
[55] *Id.*
[56] *Consumer Survey Shows Changing Definition of Food Safety*, Food Safety News (Feb. 4, 2016), https://www.foodsafetynews.com/2016/02/123246/.

65.     Bumble Bee's Products are available in a wide variety of national supermarket chains, regional stores, and other retail outlets, including stores in the District.

66.     Plaintiff GLJ–ILRF is a § 501(c)(3) non-profit public-interest organization dedicated to achieving dignity and justice for workers worldwide. GLJ-ILRF focuses on enforcing labor rights and promoting decent work conditions consistent with best practices and ILO standards in the low-wage sections of global supply chains such as commercial fishing. GLJ-ILRF engages in research, policy work, advocacy, and education of the public and consumers.

67.     A central part of GLJ-ILRF's work is to inform and educate the public, including consumers, about global supply chain business models that create patterns of harm to workers, including those working in commercial fishing.[57] Believing that "[c]onsumers have the right to know and the power to advance transparency and accountability,"[58] GLJ-ILRF "is working to make corporate global supply chains more transparent so consumers can use their dollars to stand with workers."[59] Historically, GLJ-ILRF has also published materials, like its "Shop With a Conscience" Consumer Guides, aimed at helping consumers shop ethically.[60]

68.     GLJ-ILRF also works to shed light on the falsity of various certification schemes in the seafood industry, which consumers rely on in making their purchases.[61] These include the

---

[57] *ILRF's key strategy for change is to strengthen the voices of workers and ensure they have access to justice*, ILRF, https://laborrights.org/strategies (last visited Mar. 17, 2022).

[58] *About*, ILRF, https://laborrights.org/about (last visited Mar. 17, 2022).

[59] *ILRF's key strategy, supra* note 57.

[60]     *Shop   with   a   Conscience   Consumer   Guide   Launched*,   ILRF   (Nov.   17,   2009), https://laborrights.org/blog/200911/shop-conscience-consumer-guide-launched.

[61] "We [...] work to ensure consumers can depend on the integrity of labels and certifications that purport to guarantee decent working conditions for workers who make the products." *ILRF's key strategy, supra* note 57.

FISH Standard for Crew[62] and the Marine Stewardship Council's revised Chain of Custody Certification.[63]

69.    GLJ-ILRF works with unions, civil society, and high-level actors in global supply chains to achieve responsible business practices and meaningful change.[64] GLJ-ILRF coordinates the Seafood Working Group, a global coalition of human rights, labor and environmental organizations that work together to develop and advocate for effective government policies and industry actions to end the related problems of labor exploitation, illegal fishing and overfishing in the international seafood trade.[65]

## JURISDICTION AND VENUE

70.    This court has personal jurisdiction over the parties in this case. GLJ-ILRF performs its work throughout the United States, including the District of Columbia. GLJ-ILRF is registered as a nonprofit in the District of Columbia, and some of GLJ-ILRF's staff reside and work in or near the District.

71.    This Court has personal jurisdiction over Bumble Bee because Bumble Bee has purposefully directed its conduct to the district and has availed itself of the benefits and protections of District of Columbia law.

72.    The Court has subject matter jurisdiction over this action under the CPPA, D.C. § 28-3901, *et seq.*

---

[62] Seafood Working Group, *Retailers: The FISH Standard for Crew will fail to detect labor abuse*, ILRF (Apr. 20, 2021), https://laborrights.org/publications/retailers-fish-standard-crew-will-fail-detect-labor-abuse.

[63] *Public Statement on MSC's Revised Chain of Custody Certification*, ILRF (June 10, 2019), https://laborrights.org/publications/public-statement-mscs-revised-chain-custody-certification.

[64] Kimberly Rogovin, *Time for a Sea Change*, ILRF (Mar. 2020), https://laborrights.org/sites/default/files/publications/ILRF_TimeforaSeaChange.pdf.

[65] *Seafood Working Group*, ILRF, https://laborrights.org/industries/seafood?qt-quicktabs_seafood=3#qt-quicktabs_seafood (last visited Mar. 21, 2022).

73.     Venue is proper in this Court because Bumble Bee aims marketing and advertising material at consumers within the District. Bumble Bee internet advertising is accessible in the District. Bumble Bee's Products can be, and are, purchased in the District by District consumers.

## CAUSE OF ACTION

### *Violations of the District of Columbia Consumers Protection Procedures Act*

74.     GLJ-ILRF incorporates by reference all the allegations of the preceding paragraphs of this Complaint.

75.     GLJ-ILRF is a non-profit, public-interest organization that brings these claims on behalf of the general public and District consumers. *See* D.C. Code § 28-3905(k)(1)( D)(i).

76.     Through § 28-3905(k)(1)(C), the D.C. CPPA allows for non-profit organizational standing to the fullest extent recognized by the D.C. Court of Appeals in its past and future decisions addressing the limits of Constitutional standing under Article III.

77.     Through § 28-3905(k)(1)(D)(i), the D.C. CPPA explicitly allows for public-interest organizational standing even beyond that which is afforded pursuant to § 28-3905(k)(1)(C) and allows a public-interest organization to stand in the shoes of a consumer to seek relief from any violation of the CPPA.

78.     Bumble Bee is a "person" and a merchant that provides "goods" within the meaning of the CPPA. See *id.* § 28-3901(a)(1), (3), (7).

79.     Bumble Bee has advertised and marketed the Products with phrases such as "best-in-class culture of safety" and "fair and responsible working conditions," when, in fact, Bumble Bee sells tuna products caught by laborers who are subjected to inhuman conditions that do not meet the standards Bumble Bee set for itself. Thus, Bumble Bee has violated the CPPA by "represent[ing] that goods . . . have a source . . . [or] characteristics . . . that they do not have";

"represent[ing] that goods . . . are of a particular standard, quality, grade, style, or model, if in fact they are of another"; "misrepresent[ing] as to a material fact which has a tendency to mislead"; "fail[ing] to state a material fact if such failure tends to mislead"; "us[ing] innuendo or ambiguity as to a material fact, which has a tendency to mislead"; and "advertis[ing] . . . goods . . . without the intent to sell them as advertised." See *id.* § 28-3904(a), (d), (e), (f), (f-1), (h).

## JURY TRIAL DEMAND

80.    Plaintiff GLJ-ILRF hereby demands a trial by jury.

## PRAYER FOR RELIEF

*Wherefore*, Plaintiff GLJ-ILRF prays for judgment against Bumble Bee and requests the following relief:

a.    A declaration that Bumble Bee's conduct is in violation of the CPPA;

b.    An order enjoining Bumble Bee's conduct found to be in violation of the CPPA; and

c.    An order granting Plaintiff costs and disbursements, including reasonable attorneys' fees and expert fees, and prejudgment interest at the maximum rate allowable by law.

DATED: March 21, 2021

**RICHMAN LAW & POLICY**

_____
Kim E. Richman (D.C. Bar No. 1022978)
Clark Binkley (pro hac vice forthcoming)
1 Bridge Street, Suite 83
Irvington, NY 10533
T: (718) 705-4579
krichman@richmanlawpolicy.com
cbinkley@richmanlawpolicy.com

# Superior Court of the District of Columbia

## CIVIL DIVISION- CIVIL ACTIONS BRANCH
### INFORMATION SHEET

INTERNATIONAL LABOR RIGHTS FORUM
d/b/a GLOBAL LABOR JUSTICE-INTERNATIONAL
LABOR RIGHTS FORUM

Case Number: **2022 CA 001235 B**

vs

Date: 3/21/2022

BUMBLE BEE FOODS, LLC

☐ One of the defendants is being sued
in their official capacity.

| | |
|---|---|
| Name: *(Please Print)*<br>Kim E. Richman | Relationship to Lawsuit |
| Firm Name:<br>Richman Law & Policy | ☒ Attorney for Plaintiff |
| Telephone No.:        Six digit Unified Bar No.:<br>(718) 705-4579        1022978 | ☐ Self (Pro Se)<br>☐ Other: _____ |

TYPE OF CASE:   ☐ Non-Jury        ☐ 6 Person Jury        ☒ 12 Person Jury

Demand: $ N/A _____        Other: _____

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.:_____   Judge: _____   Calendar #:_____

Case No.:_____   Judge: _____   Calendar#:_____

---

NATURE OF SUIT:        *(Check One Box Only)*

**A. CONTRACTS**                    **COLLECTION CASES**

☐ 01 Breach of Contract          ☐ 14 Under $25,000 Pltf. Grants Consent   ☐ 16 Under $25,000 Consent Denied
☐ 02 Breach of Warranty          ☐ 17 OVER $25,000 Pltf. Grants Consent   ☐ 18 OVER $25,000 Consent Denied
☐ 06 Negotiable Instrument       ☐ 27 Insurance/Subrogation                  ☐ 26 Insurance/Subrogation
☐ 07 Personal Property                Over $25,000 Pltf. Grants Consent         Over $25,000 Consent Denied
☐ 13 Employment Discrimination   ☐ 07 Insurance/Subrogation                  ☐ 34 Insurance/Subrogation
☐ 15 Special Education Fees           Under $25,000 Pltf. Grants Consent         Under $25,000 Consent Denied
                                 ☐ 28 Motion to Confirm Arbitration
                                      Award (Collection Cases Only)

**B. PROPERTY TORTS**

☐ 01 Automobile              ☐ 03 Destruction of Private Property   ☐ 05 Trespass
☐ 02 Conversion              ☐ 04 Property Damage
☐ 07 Shoplifting, D.C. Code § 27-102 (a)

**C. PERSONAL TORTS**

☐ 01 Abuse of Process            ☐ 10 Invasion of Privacy              ☐ 17 Personal Injury- (Not Automobile,
☐ 02 Alienation of Affection     ☐ 11 Libel and Slander                     Not Malpractice)
☐ 03 Assault and Battery         ☐ 12 Malicious Interference           ☐ 18 Wrongful Death (Not Malpractice)
☐ 04 Automobile- Personal Injury ☐ 13 Malicious Prosecution            ☐ 19 Wrongful Eviction
☒ 05 Deceit (Misrepresentation)  ☐ 14 Malpractice Legal                ☐ 20 Friendly Suit
☐ 06 False Accusation            ☐ 15 Malpractice Medical (Including Wrongful Death)   ☐ 21 Asbestos
☐ 07 False Arrest                ☐ 16 Negligence- (Not Automobile,     ☐ 22 Toxic/Mass Torts
☐ 08 Fraud                            Not Malpractice)                  ☐ 23 Tobacco
                                                                       ☐ 24 Lead Paint

SEE REVERSE SIDE AND CHECK HERE        IF USED

# Information Sheet, Continued

---

**C. OTHERS**

- ☐ 01 Accounting
- ☐ 02 Att. Before Judgment
- ☐ 05 Ejectment
- ☐ 09 Special Writ/Warrants
  (DC Code § 11-941)
- ☐ 10  Traffic Adjudication
- ☐ 11 Writ of Replevin
- ☐ 12 Enforce Mechanics Lien
- ☐ 16 Declaratory Judgment

- ☐ 17 Merit Personnel Act (OEA)
  (D.C. Code Title 1, Chapter 6)
- ☐ 18 Product Liability

- ☐ 24 Application to Confirm, Modify,
  Vacate Arbitration Award (DC Code § 16-4401)
- ☐ 29 Merit Personnel Act (OHR)
- ☐ 31 Housing Code Regulations
- ☐ 32 Qui Tam
- ☐ 33 Whistleblower

---

**II.**

- ☐ 03 Change of Name
- ☐ 06 Foreign Judgment/Domestic
- ☐ 08 Foreign Judgment/International
- ☐ 13 Correction of Birth Certificate
- ☐ 14 Correction of Marriage
  Certificate
- ☐ 26 Petition for Civil Asset Forfeiture (Vehicle)
- ☐ 27 Petition for Civil Asset Forfeiture (Currency)
- ☐ 28 Petition for Civil Asset Forfeiture (Other)

- ☐ 15 Libel of Information
- ☐ 19 Enter Administrative Order as
  Judgment [ D.C. Code §
  2-1802.03 (h) or 32-151 9 (a)]
- ☐ 20 Master Meter (D.C. Code §
  42-3301, et seq.)

- ☐ 21 Petition for Subpoena
  [Rule 28-I (b)]
- ☐ 22 Release Mechanics Lien
- ☐ 23 Rule 27(a)(1)
  (Perpetuate Testimony)
- ☐ 24 Petition for Structured Settlement
- ☐ 25 Petition for Liquidation

---

**D.  REAL PROPERTY**

- ☐ 09 Real Property-Real Estate
- ☐ 12 Specific Performance
- ☐ 04 Condemnation (Eminent Domain)
- ☐ 10 Mortgage Foreclosure/Judicial Sale
- ☐ 11 Petition for Civil Asset Forfeiture (RP)

- ☐ 08 Quiet Title
- ☐ 25 Liens: Tax / Water Consent Granted
- ☐ 30 Liens: Tax / Water Consent Denied
- ☐ 31 Tax Lien Bid Off Certificate Consent Granted

---

_____
Attorney's Signature

3/21/2022
_____
Date



**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
**Telephone: (202) 879-1133 • Website: www.dccourts.gov**

INTERNATIONAL LABOR RIGHTS FORUM
   Vs.                              C.A. No.       2022 CA 001235 B
BUMBLE BEE FOODS, LLC

## INITIAL ORDER AND ADDENDUM

### Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("Super. Ct. Civ. R.") 40-I, it is hereby ORDERED as follows:

(1) This case is assigned to the judge and calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of service on each defendant of copies of (a) the summons, (b) the complaint, and (c) this Initial Order and Addendum. The court will dismiss the claims against any defendant for whom such proof of service has not been filed by this deadline, unless the court extended the time for service under Rule 4(m).

(3) Within 21 days of service (unless otherwise provided in Rule 12), each defendant must respond to the complaint by filing an answer or other responsive pleading. The court may enter a default and a default judgment against any defendant who does not meet this deadline, unless the court extended the deadline under Rule 55(a).

(4) At the time stated below, all counsel and unrepresented parties shall participate in a remote hearing to establish a schedule and discuss the possibilities of settlement. Counsel shall discuss with their clients **before** the hearing whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this hearing.**

(5) If the date or time is inconvenient for any party or counsel, the Civil Actions Branch may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. To reschedule the hearing, a party or lawyer may call the Branch at (202) 879-1133. Any such request must be made at least seven business days before the scheduled date.
No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

**Chief Judge Anita M. Josey-Herring**

Case Assigned to: Judge SHANA FROST MATINI
Date:     March 24, 2022
Initial Conference: **REMOTE HEARING - DO NOT COME TO COURTHOUSE**
**SEE REMOTE HEARING INSTRUCTIONS ATTACHED TO INITIAL ORDER**

9:30 am, Friday, June 24, 2022
Location:   Courtroom 517
               500 Indiana Avenue N.W.
               WASHINGTON, DC 20001

                  CAIO-60

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

D.C. Code § 16-2821, which part of the Medical Malpractice Proceedings Act of 2006, provides,   "[a]fter action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ('ISSC'"), prior to any further litigation in an effort to reach a settlement agreement.   The early mediation schedule shall be included in the Scheduling Order following the ISSC.  Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC."

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator.  Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/.  To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. D.C. Code § 16-2825 Two separate Early Mediation Forms are available.   Both forms may be obtained at www.dccourts.gov/medmalmediation.  One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator.  Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. Unrepresented plaintiffs who elect not to eFile must either mail the form to the Multi-Door Dispute Resolution Office at, Suite 2900, 410 E Street, N.W., Washington, DC 20001, or deliver if in person if the Office is open for in-person visits.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation.  D.C. Code § 16-2823(a).  If the parties cannot agree on a mediator, the Court will appoint one.  D.C. Code § 16-2823(b).

The following people are required by D.C. Code § 16-2824 to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code§ 16-2826.  Any Plaintiff who is unrepresented may mail the form to the Civil Actions Branch at [address] or deliver it in person if the Branch is open for in-person visits. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief Judge Anita M. Josey-Herring

CAIO-60

Civil Remote Hearing Instructions for Participants

The following instructions are for participants who are scheduled to have cases heard before a Civil Judge in a **Remote Courtroom**

**Option1:  (AUDIO ONLY/Dial-in by Phone):**

Toll 1 (844) 992-4762 or (202) 860-2110, enter the Meeting ID from the attachment followed by #, press again to enter session.

⁂   *Please call in no sooner than 5 minutes before your scheduled hearing time. Once you have joined the session, please place your phone on mute until directed otherwise.  If you should happen to get disconnected from the call, please call back in using the phone number and access number provided and the courtroom clerk will mute your call until the appropriate time.*

If you select **Option 2** or **Option 3** use the Audio Alternative

**Option 2: (LAPTOP/ DESKTOP USERS 1):**

Open Web Browser in Google Chrome and copy and paste following address from the next page:
https://dccourts.webex.com/meet/XXXXXXXXX

**Option 3: (LAPTOP/ DESKTOP USERS 2):**

Open Web Browser in Google Chrome and copy and paste following address
https://dccourts.webex.com   Select **Join**, enter the Meeting ID from the next page

AUDIO ALTERNATIVE**:**  Instead of automatically using **USE COMPUTER FOR AUDIO**, select **CALL-IN** and follow the **CALL-IN** prompt window.  Use a cell phone or desk phone. You will be heard clearer if you **do not** place your phone on SPEAKER. It is very important that you enter the **ACCESS ID #** so that your audio is matched with your video. 

**Option 4: (Ipad/SMART PHONE/TABLET):**

- Go to App Store, Download WebEx App (Cisco WebEx Meetings)
- Sign into the App with your Name and Email Address
- Select Join Meeting
- Enter address from the next page: https://dccourts.webex.com/meet/XXXXXXXXX
- Click join and make sure your microphone is muted and your video is unmuted (if you need to be
- seen). If you only need to speak and do not need to be seen, use the audio only option.
- When you are ready click "Join Meeting". If the host has not yet started the meeting, you will be placed in the lobby until the meeting begins.

**For Technical Questions or issues Call: (202) 879-1928, Option #2**

Superior Court of the District of Columbia
Public Access for Remote Court Hearings
(Effective August 24, 2020)

**The current telephone numbers for all remote hearings are: 202-860-2110 (local) or 844-992-4726 (toll free).** After dialing the number, enter the WebEx Meeting ID as shown below for the courtroom. Please click a WebEx Direct URL link below to join the hearing online.

Audio and video recording; taking pictures of remote hearings; and sharing the live or recorded remote hearing by rebroadcasting, live-streaming or otherwise are not allowed

| Division | Courtroom | Types of Hearings Scheduled in Courtroom | Public Access via WebEx | |
|---|---|---|---|---|
| | | | **WebEx Direct URL** | **WebEx Meeting ID** |
| Auditor Master | 206 | Auditor Master Hearings | https://dccourts.webex.com/meet/ctbaudmaster | 129 648 5606 |
| Civil | 100 | Civil 2 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb100 | 129 846 4145 |
| | 205 | Foreclosure Matters | https://dccourts.webex.com/meet/ctb205 | 129 814 7399 |
| | 212 | Civil 2 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb212 | 129 440 9070 |
| | 214 | Title 47 Tax Liens; and Foreclosure Hearings | https://dccourts.webex.com/meet/ctb214 | 129 942 2620 |
| | 219 | Civil 2 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb219 | 129 315 2924 |
| | 221 | Civil 1 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb221 | 129 493 5162 |
| | 318 | Civil 2 Scheduling Conferences; Status, | https://dccourts.webex.com/meet/ctb318 | 129 801 7169 |
| | 320 | Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb320 | 129 226 9879 |

CAIO-60

| 400 | Judge in Chambers Matters including Temporary Restraining Orders, Preliminary Injunctions and Name Changes | https://dccourts.webex.com/meet/ctb400 | 129 339 7379 |
|---|---|---|---|
| 415 | Civil 2 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb415 | 129 314 3475 |
| 516 | | https://dccourts.webex.com/meet/ctb516 | 129 776 4396 |
| 517 | | https://dccourts.webex.com/meet/ctb517 | 129 911 6415 |
| 518 | | https://dccourts.webex.com/meet/ctb518 | 129 685 3445 |
| 519 | | https://dccourts.webex.com/meet/ctb519 | 129 705 0412 |
| JM-4 | | https://dccourts.webex.com/meet/ctbjm4 | 129 797 7557 |
| A-47 | Housing Conditions Matters | https://dccourts.webex.com/meet/ctba47 | 129 906 2065 |
| B-52 | Debt Collection and Landlord and Tenant Trials | https://dccourts.webex.com/meet/ctbb52 | 129 793 4102 |
| B-53 | Landlord and Tenant Matters including Lease Violation Hearings and Post Judgment Motions | https://dccourts.webex.com/meet/ctbb53 | 129 913 3728 |
| B-109 | Landlord and Tenant Matters | https://dccourts.webex.com/meet/ctbb109 | 129 127 9276 |
| B-119 | Small Claims Hearings and Trials | https://dccourts.webex.com/meet/ctbb119 | 129 230 4882 |

CAIO-60

# EXHIBIT D

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
KIM E. RICHMAN | SBN: 1022978
RICHMAN LAW & POLICY
1 BRIDGE ST., STE 83  IRVINGTON, NY 10533

TELEPHONE NO.: (718) 705-4579 | FAX NO. : | E-MAIL ADDRESS (Optional): krichman@richmanlawpolicy.com

ATTORNEY FOR (Name): :

FOR COURT USE ONLY

**Filed**
**D.C. Superior Court**
**04/06/2022 14:05PM**
**Clerk of the Court**

**SUPERIOR COURT OF THE DISCTRICT OF COLUMBIA**

STREET ADDRESS: 500 INDIANA AVENUE, N.W., SUITE 5000

MAILING ADDRESS:

CITY AND ZIP CODE: WASHINGTON, DC 20001

BRANCH NAME:

Hearing Date:                Room:
Hearing Time:               Dept:

PLAINTIFF: INTERNATIONAL LABOR RIGHTS FORUM D/B/A GLOBAL LABOR
JUSTICE-INTERNATIONAL LABOR RIGHTS FORUM,
DEFENDANT: BUMBLE BEE FOODS, LLC

CASE NUMBER:

**2022 CA 001235 B**

| **PROOF OF SERVICE** | Ref. No. or File No.: **5168892** |
|---|---|

AT THE TIME OF SERVICE I WAS AT LEAST 18 YEARS OF AGE AND NOT A PARTY TO THIS ACTION
**I SERVED COPIES** OF THE FOLLOWING DOCUMENTS:

**SUMMONS; COMPLAINT**

PARTY SERVED: **BUMBLE BEE FOODS, LLC**

PERSON SERVED: **CT CORPORATION SYSTEM - AGENT FOR SERVICE - JOHN M. - INTAKE CLERK**

DATE & TIME OF DELIVERY: **4/4/2022**
**11:47 AM**

ADDRESS, CITY, AND STATE: **330 N Brand Blvd Ste 700**
**Glendale, CA 91203**

PHYSICAL DESCRIPTION: **Age: 30          Weight: 170          Hair: BLACK**
**Sex: Male          Height: 5'11          Race: HISPANIC**

MANNER OF SERVICE:
**Personal Service - By personally delivering copies.**

Fee for Service:
    County:  LOS ANGELES
        Registration No.:  2012208220
    County:  LOS ANGELES
        VERITEXT
        633 EAST COLONIAL DRIVE
        ORLANDO, FL 32803
        (800) 275-7991
        Ref: 5168892

I declare under penalty of perjury under the laws of the
The State of California that the foregoing information
contained in the return of service and statement of
service fees is true and correct and that this declaration
was executed on  April 5, 2022.

Signature: _____

ERIC WILKINS

**PROOF OF SERVICE**

Order#: 183224/General

# EXHIBIT E

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

| | | |
|---|---|---|
| INTERNATIONAL LABOR RIGHTS FORUM | : | Case Number: 2022 CA 1235 B |
| | : | |
| v. | : | Judge: Shana Frost Matini |
| | : | |
| BUMBLE BEE FOODS, LLC | : | Scheduling Conference: June 24, 2022 |

### <u>ORDER</u>

Upon consideration of the Unopposed Motion to Extend the Time to Respond to

Plaintiff's Complaint, filed on April 19, 2022, and for good cause shown, it is this 25th day of

April 2022 hereby:

**ORDERED** that the Unopposed Motion to Extend the Time to Respond to Plaintiff's

Complaint is **GRANTED**; and it is further

**ORDERED** that Defendant shall file its response to Plaintiff's complaint on or before

May 9, 2022.

**SO ORDERED**.

Judge Shana Frost Matini
Superior Court of the District of Columbia

Copies served by CaseFileXpress on counsel of record

# EXHIBIT F

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**Civil Division**

| | |
|---|---|
| INTERNATIONAL LABOR RIGHTS FORUM d/b/a GLOBAL LABOR JUSTICE-INTERNATIONAL LABOR RIGHTS FORUM,<br><br>        Plaintiff,<br><br>    v.<br><br>BUMBLE BEE FOODS, LLC,<br><br>        Defendant. | No. 2022 CA 001235 B<br>Judge Shana Frost Matini |

## <u>NOTICE OF FILING NOTICE OF REMOVAL</u>

PLEASE TAKE NOTICE that Defendant Bumble Bee Foods, LLC has on this date filed its Notice of Removal, a copy of which is attached, in the Office of the Clerk of the United States District Court for the District of Columbia.

DATED:  May 2, 2022

Respectfully submitted,

By:  /s/ *Justin Anderson*
Justin Anderson (D.C. Bar No. 1030572)
Jake E. Struebing (D.C. Bar No. 1673297)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street, NW
Washington, DC 20006
Telephone: (202) 223-7300
Facsimile:  (202) 223-7420
janderson@paulweiss.com
jstruebing@paulweiss.com

William Michael (*pro hac vice* forthcoming)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile:  (212) 757-3990
wmichael@paulweiss.com

*Attorneys for Defendant Bumble Bee Foods, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 2, 2022, a true and correct copy of the foregoing was served by electronic and first class mail on the following counsel of record for Plaintiff:

Kim E. Richman
Clark Binkley
1 Bridge Street, Ste. 83
Irvington, NY 10533
Telephone: (718) 878-4707
Facsimile: (212) 687-8292
krichman@richmanlawpolicy.com
cbinkley@richmanlawpolicy.com

 /s/ *Justin Anderson*
Justin Anderson (D.C. Bar No. 1030572)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street, NW
Washington, DC 20006
Telephone: (202) 223-7300
Facsimile:  (202) 223-7420
janderson@paulweiss.com

2